# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Michael v. Precision Alliance Group, LLC*, 2011 IL App (5th) 100089

---

| | |
|---|---|
| Appellate Court Caption | WAYNE MICHAEL, ALAN HOHMAN, and CRAIG KLUEMKE, Plaintiffs-Appellants, v. PRECISION ALLIANCE GROUP, LLC, Defendant-Appellee. |
| District & No. | Fifth District<br>Docket No. 5–10–0089 |
| Filed | July 21, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The entry of summary judgment for defendant in a retaliatory discharge action was reversed, since a genuine issue of material fact existed as to whether plaintiffs were discharged for a valid, nonpretextual reason or for their whistle-blowing activities. |
| Decision Under Review | Appeal from the Circuit Court of Washington County, No. 03–L–20; the Hon. Dennis G. Hatch, Judge, presiding. |
| Judgment | Reversed; cause remanded. |

Counsel on
Appeal

Christopher B. Daniels, of Daniels Law Office, of Centralia, and Ferne P. Wolf, of Sowers & Wolf, LLC, of St. Louis, Missouri, for appellants.

Julie L. Gottshall and Kyle A. Petersen, both of Katten Muchin Rosenman LLP, of Chicago, for appellee.

Panel

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.

Justices Donovan and Wexstten concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiffs, Wayne Michael, Alan Hohman, and Craig Kluemke, filed suit for retaliatory discharge against defendant, Precision Alliance Group, LLC, in the circuit court of Washington County. Upon the motion of defendant, the court entered a summary judgment. On appeal, plaintiffs raise issues regarding whether the record presents genuine issues of material fact precluding the entry of a summary judgment. We reverse and remand.

¶ 2                   FACTS

¶ 3    Defendant is an agricultural supply business dealing in soybeans. Defendant grows, conditions, packages, and distributes soybean seeds for commercial agricultural use. It contracts with local farmers to grow soybeans for seed production, conditions the seeds, and packs them into 50-pound bags and 2,000-pound bags for commercial sale. Defendant contends that it implemented strict protocols to ensure that each bag was properly filled, and it points out that each plaintiff testified in depositions to being thoroughly trained to monitor and correct any issue with low-weight bags. Defendant further contends that it customarily filled the bags with more than the labeled weight in order to compensate for normal seed shrinkage that would occur after bagging.

¶ 4    Each of the plaintiffs worked at defendant's facility in Nashville, Illinois. During that time, approximately 20 laborers and 4 on-site management staff members worked at the facility. Hohman worked on the bagging line, Kluemke worked in the bagging room, and Michael worked in the warehouse. Hohman was fired on March 18, 2003, and Michael and Kluemke were fired on April 11, 2003.

¶ 5    Defendant contends that despite implementing stringent protocols, it began experiencing a problem with underweight seed bags. According to the affidavit of defendant's general manager, Gary Shepherd, defendant first noticed a problem with weights in December 2002. Defendant discovered that an outgoing truck full of unbagged seeds was underweight, and

-2-

it added additional seed to the load to make it compliant. Shepherd attested that a random check of bags in the warehouse to determine if there was an ongoing problem was "inconclusive."

¶ 6     On February 10, 2003, inspectors from the Illinois Department of Agriculture (Department) showed up to investigate a complaint of underweight seed bags. During the investigation, the Department found some low-weight bags and entered a stop-sale order. Shepherd attested that defendant fully cooperated with the investigation and instituted its own quality control actions. The Department would not reveal the source of the complaint. On February 20, 2003, the Department lifted the stop-sale order and ended the investigation without issuing a penalty or fine.

¶ 7     Plaintiffs offer a different interpretation of events. For example, in his deposition, Kluemke described reporting his discovery of an underweight truckload to assistant manager Matt Alcorn in December 2002. Alcorn told Kluemke to add seed to the load, but Kluemke testified that the problem "went on for another two months where they went out and checked and weighed bags and they were all light." Similarly, Michael testified, "[W]e were running light on every load." Shawn Dudley, another employee of defendant, testified in his deposition that he, along with Hohman, reported an underweight load and was told by management that the scales had not been checked in five years but that the problem would be corrected. Dudley testified that he stated, "Ain't that kind of wrong?" Defendant contends that Dudley's employment was later terminated for playing a dangerous prank with a forklift. Dudley was fired in January 2003.

¶ 8     Dudley called Kluemke sometime after being fired and stated that if he did not get unemployment benefits, he was going to call the State. Kluemke described the initial conversation with Dudley:

"Q. [Attorney for plaintiffs:] And what was your response?

A. I told him, I said, 'Have at it.' I said, 'Somebody's got to do something.'

Q. Did you tell him you'd assist him in any way?

A. No at that time probably I didn't, no.

Q. If that was your opinion that he should have at it, why didn't you call the State?

A. Afraid of losing my job, just like I did.

Q. And I'm correct that you never contacted the State directly about this?

A. No, I did not."

¶ 9     Kluemke, Michael, and Hohman assert that they recorded locations and lot numbers of light bags and relayed the information to Dudley, who in turn supplied the information to the Department.

¶ 10     Plaintiffs contend that they were fired as a result of defendant's belief that they had played a role in reporting to the Department. For instance, Hohman testified as follows:

"A. They had–I think they had suspicions that I was part of the group that had turned them in to the State. I had had a previous conversation a week or so before that just in general talking with Terry Weier, and he just came straight out and told me if we find out that anybody here had anything to do with turning us in to the State, that their jobs will

be terminated immediately. I was told that point-blank by Terry Weier."

Defendant contends that Hohman was discharged for ramming a forklift he was driving into another forklift and that Michael and Kluemke were let go as a part of a corporate-ordered reduction in force.

¶ 11 Plaintiffs filed a complaint seeking damages for retaliatory discharge. The circuit court entered a summary judgment in favor of defendant. Plaintiffs appeal.

¶ 12          ANALYSIS

¶ 13 In Illinois, employees who serve absent a contract are considered at-will and generally may be discharged for any or no reason. *Rabin v. Karlin & Fleisher, LLC*, 409 Ill. App. 3d 182, 186, 945 N.E.2d 681, 687 (2011). Retaliatory discharge is an exception to this rule. *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 500, 911 N.E.2d 369, 374 (2009).

¶ 14 Illinois common law recognizes a cause of action for retaliatory discharge. *Callahan v. Edgewater Care & Rehabilitation Center, Inc.*, 374 Ill. App. 3d 630, 634, 872 N.E.2d 551, 554 (2007). This tort is limited and narrow. *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 19, 694 N.E.2d 565, 569 (1998). The limited scope of retaliatory discharge is an attempt to achieve a "proper balance" between the employer's interest in maintaining an efficient and profitable business while recognizing the competing interests of the employee in earning a livelihood and society's interest in effectuating vital public policies. *Turner*, 233 Ill. 2d at 502, 911 N.E.2d at 375 (relying on *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 507, 568 N.E.2d 870, 876 (1991)).

¶ 15 In order to maintain a claim for retaliatory discharge, an employee must prove the following: (1) the employment was terminated by the employer, (2) the discharge was in retaliation for action of the employee, and (3) the discharge violates a clear mandate of public policy. *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 529, 478 N.E.2d 1354, 1358 (1985).

¶ 16 Defendant does not contest that it discharged plaintiffs but asserts that plaintiffs failed to present any evidence regarding the remaining elements. At issue are the remaining elements of whether plaintiffs were discharged for protected activities and whether the discharge violated a clear mandate of public policy. Plaintiffs raised issues of material fact regarding these elements sufficient to survive a summary judgment.

¶ 17         Protected Activity

¶ 18 A plaintiff claiming a retaliatory discharge must prove that he engaged in protected activity. The oft-repeated description of this element is that an employee must prove that his discharge was "in retaliation for the employee's activities." *Turner*, 233 Ill. 2d at 500, 911 N.E.2d at 374; *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 134, 421 N.E.2d 876, 881 (1981). The protected activities vary. Illinois has allowed plaintiffs to proceed on claims that they were discharged for filing a workers' compensation claim and for refusing to engage in illegal or unsafe activities. See, *e.g.*, *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 182, 384 N.E.2d 353, 357 (1978) (workers' compensation); *Russ v. Pension Consultants Co.*, 182 Ill. App. 3d 769, 777, 538 N.E.2d 693, 698 (1989) (a refusal to file false tax returns);

*Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502, 510, 485 N.E.2d 372, 377 (1985) (a refusal to work under unsafe conditions).

¶ 19    Illinois has also recognized a retaliatory discharge when employees have reported illegal activity. As was stated in *Mackie*:

"More specifically, retaliatory discharge claims have emerged under two theories: (1) a 'clear mandate' action, alleging that the complained-of conduct contravenes a clearly mandated public policy, but not necessarily a law; and (2) a 'citizen crime-fighter' theory. [Citation.] Citizen crime-fighter cases usually involve an employee terminated for 'whistle-blowing' or telling of a coworker's commission of an alleged crime; however, the crime does not have to be work-related." *Mackie v. Vaughan Chapter–Paralyzed Veterans of America, Inc.*, 354 Ill. App. 3d 731, 734, 820 N.E.2d 1042, 1045 (2004).

¶ 20    The circuit court's order could be read as holding that plaintiffs' alleged activities were not protected on two levels. First, the circuit court pointed out that plaintiffs did not report the alleged conduct of defendant directly to a government agency. Second, the court held that plaintiffs could not sustain a claim of retaliatory discharge based on defendant's mistaken belief that plaintiffs had reported directly. Neither the lack of a direct report nor a mistaken belief about the details of plaintiffs' activities precludes the claims for retaliatory discharge.

¶ 21    The circuit court and defendant have drawn a distinction between direct reporting and indirect reporting. The circuit court noted that plaintiffs never reported directly to a government agency. The court stated, "[Plaintiffs] merely reported information to a former employee who had his separate motive for reporting the alleged weight of the seed bags." Defendant equates this activity with "gossiping." Taken in a light most favorable to plaintiffs, however, the record supports the conclusion that plaintiffs were transmitting information to Dudley with the explicit purpose that he work with the Department. The fact that Dudley, who is not a plaintiff, might have had a different motive is irrelevant. Plaintiffs' intent and defendant's motive are the pertinent questions.

¶ 22    The Whistleblower Act provides no guidance. 740 ILCS 174/1 *et seq.* (West 2004). The Whistleblower Act prohibits an employer from discharging an employee for "disclosing information to a government or law enforcement agency." 740 ILCS 174/15 (West 2004). Arguably, the disclosure could be through a third party, because the term "disclosing" is not defined. Regardless, the common law is separate from the Whistleblower Act. *Callahan v. Edgewater Care & Rehabilitation Center, Inc.*, 374 Ill. App. 3d 630, 634, 872 N.E.2d 551, 553 (2007). Illinois courts have looked to aspects other than the mechanism or directness of the whistleblowing when evaluating whether an activity is protected under the tort of retaliatory discharge.

¶ 23    Illinois has looked to both the intent of the plaintiff and the motive of the employer in evaluating retaliatory discharge actions based on whistleblowing. Undoubtedly, the intent of the employee to blow the whistle is vital to a claim of retaliatory discharge. As was stated in *Palmateer*, the matter "must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Palmateer*, 85 Ill. 2d at 130, 421 N.E.2d at 878-79.

¶ 24    Defendant points to precedent describing protected activities as including reporting to government agencies, but in no instance has Illinois required an employee to make a direct report to a government agency. See *Callahan*, 374 Ill. App. 3d at 634, 872 N.E.2d at 553. Instead, when courts evaluate the intent of employees, the test has been whether the plaintiffs acted on a good-faith belief that an employer was violating the law. *Mackie*, 354 Ill. App. 3d at 734, 820 N.E.2d at 1045; *Stebbings v. University of Chicago*, 312 Ill. App. 3d 360, 371, 726 N.E.2d 1136, 1145 (2000). Indeed, imposing a requirement that increases an employee's risk of exposure to a potentially hostile employer runs counter to the underlying principle that employees acting in good faith should not be deterred from reporting by a fear of a retaliatory discharge.

¶ 25    At the crux of causation in retaliatory discharge actions is the question of whether the employer had a retaliatory motive. *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 568, 900 N.E.2d 353, 359 (2008). The interrelationship of the protected activity with the clearly mandated public policy reveals a purpose to prevent and correct misbehavior by employers. The tort is " 'intended to neutralize the power potentially available to employers to frustrate the state policies underlying those laws.' "*Stebbings*, 312 Ill. App. 3d at 367, 726 N.E.2d at 1141 (quoting *Fowler v. Great American Insurance Cos.*, 653 F. Supp. 692, 694 (N.D. Ill. 1987)). Thus, the determination of what activity should be protected involves the question of whether an employer is frustrating " 'a significant public policy by using its power of dismissal in a coercive manner.' " (Emphasis omitted.) *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 20, 694 N.E.2d 565, 569 (1998) (quoting *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 508, 568 N.E.2d 870, 876 (1991)).

¶ 26    Whether plaintiffs reported directly to a government agency or relayed information through another person is irrelevant to questions of whether the motive of defendant was retaliatory and whether the intent of plaintiffs was to blow the whistle. Similarly, a mistaken belief by an employer regarding the mechanism by which an employee blew a whistle should not bar an action. Defendant's mistaken belief that plaintiffs had reported directly, and not indirectly, is irrelevant to whether defendant's motive was retaliatory or whether plaintiffs acted with an intent to blow the whistle. Likewise, plaintiffs alleged facts in the complaint with sufficient particularity to support a claim for relief. See *Turner*, 233 Ill. 2d at 499, 911 N.E.2d at 373. Plaintiffs alleged that they "participated and/or defendant believed plaintiffs participated in activity which led the State of Illinois to conduct a surprise investigation of defendant's practices relating to the weighing and reporting of the weights of sacks of soybean seed." The record raised questions of material fact regarding this allegation, and those questions preclude a summary judgment.

¶ 27                              Clear Mandate

¶ 28    The third element of a claim of retaliatory discharge is whether the discharge violated a clear mandate of public policy. As a general rule, the ascertainment of public policy and the determination of whether the policy is undermined by an employee's discharge are questions of law for the courts. *Turner*, 233 Ill. 2d at 501, 911 N.E.2d at 374-75. The determination of whether a discharge violated a clear mandate of public policy is generally a question of law.

*Turner*, 233 Ill. 2d at 502, 911 N.E.2d at 375.

¶ 29 In the absence of a clearly mandated public policy, an employer retains the right to discharge workers at will. *Palmateer*, 85 Ill. 2d at 130, 421 N.E.2d at 878. As the circuit court adroitly noted, the mere citation to vital legislation is insufficient to satisfy this element. Broad, generalized statements of public policy fail to justify imposing restrictions on employers. *Turner*, 233 Ill. 2d at 502, 911 N.E.2d at 375. This requirement limits the tort to its proper scope. Defendant asserts that all aspects of the tort, including what type of activity deserves protection, must be construed in as narrow a fashion as possible. This assertion is mistaken. The requirement that the tort apply only in cases involving a clear mandate of public policy balances the competing interests and ensures that the tort is applied narrowly. *Turner* concluded as follows:

> "Adherence to a narrow definition of public policy, as an element of a retaliatory discharge action, maintains the balance among the recognized interests. Employees will be secure in knowing that their jobs are safe if they exercise their rights according to a clear mandate of public policy. Employers will know that they may discharge their at-will employees for any or no reason unless they act contrary to public policy. Finally, the public interest in the furtherance of its public policies, the stability of employment, and the elimination of frivolous lawsuits is maintained. See *Fellhauer*, 142 Ill. 2d at 507, quoting *Palmateer*, 85 Ill. 2d at 133; *Pierce*, 84 N.J. at 73, 417 A.2d at 512." *Turner*, 233 Ill. 2d at 507, 911 N.E.2d at 378.

¶ 30 Although the circuit court found that several of the grounds listed by plaintiffs failed to satisfy this test, it stated that plaintiffs had identified clear expressions of public policy based on the Illinois Seed Law (505 ILCS 110/1 *et seq.* (West 2010)) and the federal establishment of the National Institute of Standards and Technology (15 U.S.C. § 271 (2006)). The alleged conduct falls under the purview of regulations established by the Illinois Seed Law. The Illinois Seed Law creates a statutory scheme governing aspects of the sale of seed, including proper labeling and weighing. 505 ILCS 110/1 *et seq.* (West 2010). The Illinois Administrative Code sets forth regulations for the Department to enforce pursuant to the Illinois Seed Law. 8 Ill. Adm. Code 230.40 (2011); 505 ILCS 110/8 (West 2010).

¶ 31 Plaintiffs set forth a claim that their discharge violated the clear mandate of public policy underlying the Illinois Seed Law. According to plaintiffs, as a result of their relaying of information through Dudley, defendant was investigated for violating the Illinois Seed Law. That discharge would be a violation of clear public policy. The purpose of the Illinois Seed Law is "to regulate the labeling, sale, offering, exposing or transporting for sale of agricultural, vegetable and other seeds; [and] to prevent misrepresentation thereof." 505 ILCS Ann. 110/1, Historical & Statutory Notes, at 600 (Smith-Hurd 2004).

¶ 32 The mislabeling and distortion of weight as asserted by plaintiffs unambiguously ran counter to this policy. Whistleblowing concerning that activity concerns "what is right and just and what affects the citizens of the State collectively." *Palmateer*, 85 Ill. 2d at 130, 421 N.E.2d at 878. A discharge in retaliation for employees forwarding the information for that violation would support a claim for retaliatory discharge.

¶ 33 Defendant contends that a judgment in its favor is justified on other grounds. In

-7-

particular, defendant contends that plaintiffs failed to present sufficient evidence that plaintiffs' discharge was causally related to their whistleblowing activities. Defendant asserts that there were valid nonpretextual reasons for terminating the employment and that defendant did not even know of plaintiffs' involvement in the investigation. Defendant further asserts that it had not been aware of the problem with the weights and that it received no benefit from any discrepancies in weighing.

¶ 34    None of the assertions made by defendant warranted a summary judgment. The determination of the reason for an employee's discharge often relies on circumstantial evidence. *Hugo v. Tomaszewski*, 155 Ill. App. 3d 906, 910, 508 N.E.2d 1139, 1141 (1987). Thus, the question of whether there is a causal connection to an employee's discharge or whether an employee was discharged for a valid, nonpretextual reason is usually not ripe for a summary judgment. *Zuccolo v. Hannah Marine Corp.*, 387 Ill. App. 3d 561, 568, 900 N.E.2d 353, 359 (2008). The question of whether defendant was unaware of having inadequate scales or was involved in purposefully underweighing seed is a question of fact. So is the reason for plaintiffs' termination. Plaintiffs testified to a sequence of events and interactions with the management of defendant sufficient to raise genuine issues of fact regarding whether they were discharged in retaliation for whistleblowing activities.

¶ 35                                    CONCLUSION

¶ 36    Accordingly, the order of the circuit court entering a summary judgment is hereby reversed, and the matter is remanded for further proceedings,

¶ 37    Reversed; cause remanded.