# Illinois Official Reports

## Supreme Court

***Michael v. Precision Alliance Group, LLC*, 2014 IL 117376**

| | |
|---|---|
| Caption in Supreme Court: | WAYNE MICHAEL *et al.*, Appellees, v. PRECISION ALLIANCE GROUP, LLC, Appellant. |
| Docket No. | 117376 |
| Filed | December 4, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Judgment for defendant employer was proper in an action for the tort of retaliatory discharge where, although plaintiff employees made out a *prima facie* case in that they were terminated shortly after reporting the employer's alleged legal violations in shipping underweight seed bags and the judge referred to this as "causal nexus," nevertheless plaintiffs failed in their burden of proving causation where the employer responded with valid, nonpretextual reasons for the discharges which were believed by the trier of fact. |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of Washington County, the Hon. Dennis G. Hatch, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment affirmed. |

Counsel on  Julie L. Gottshall and Laura D. Waller, of Katten Muchin Rosenman
Appeal      LLP, of Chicago, for appellant.

Ferne P. Wolf and Joshua M. Pierson, of Sowers & Wolf, LLC, of St. Louis, Missouri, and Christopher B. Daniels, of Salem, for appellees.

Craig L. Unrath, of Heyl, Royster, Voelker & Allen, of Peoria, for *amicus curiae* Illinois Association of Defense Trial Counsel.

Lee Barron, of Alton, and J. Bryan Wood, of Chicago, for *amicus curiae* National Employment Lawyers Association-Illinois.

Justices  JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Karmeier, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1  The plaintiffs, Wayne Michael, Alan Hohman and Craig Kluemke, filed a retaliatory discharge lawsuit against the defendant, Precision Alliance Group, LLC, alleging they were discharged in retaliation for reporting defendant to the State of Illinois for shipping underweight product. Following a bench trial, the circuit court of Washington County entered judgment in favor of defendant. The appellate court reversed the judgment of the circuit court and remanded the matter for a determination of damages. 2014 IL App (5th) 120517-U. For the reasons that follow, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 2                      BACKGROUND

¶ 3  The following facts were introduced at trial. Defendant is an agricultural supply business dealing in soybean seeds. Defendant grows, conditions, packages, and distributes soybean seeds for commercial agricultural use. It packages seed in 50-pound and 2,000-pound bags.

¶ 4  Plaintiffs worked at defendant's facility in Nashville, Illinois, from 1998 to 2003. Hohman worked on the bagging line and was responsible for ensuring proper weights, lot numbers, seed count, and dates. Kluemke worked in the bagging room and then the warehouse and was responsible for taking product off the line, moving it to various places around the warehouse, and staging the product for shipment. Michael worked in the warehouse and in shipping.

¶ 5  During the time plaintiffs were employed by defendant, approximately 20 laborers and 4 on-site management staff members worked at the Nashville facility. The management staff consisted of general manager Gary Shepherd, assistant plant manager Matt Alcorn, conditioning and safety manager Terry Weier, and field service manager Steven Mauer.

¶ 6    The events underlying this lawsuit began in late 2002. At that time, defendant began experiencing a problem with underweight seed bags. Illinois law requires that every bag labeled as containing a certain weight of seeds actually weigh that amount. In December 2002, defendant discovered that an outgoing load of seed was underweight. Additional seed was added to the load to make it compliant. Thereafter, defendant randomly checked bags in the warehouse to determine if there was an ongoing problem. In one of the checks, the majority of the bags were compliant but some were light by as much as 20 pounds. One of defendant's employees testified that the underweight bags were segregated and not shipped, while another stated they were put back in the lot. Conflicting testimony was also presented as to who decided not to test additional bags to determine the extent of the weight problem.

¶ 7    In January 2003, an employee who worked on the bagging line, Shawn Dudley, was terminated for engaging in horseplay. According to the evidence presented at trial, Dudley placed a block of sticky notes to hold down the brake of a forklift so that when the forklift was turned on and put in gear, it would not move. Dudley admitted he had tampered with the forklift.

¶ 8    Following his termination, Dudley told Hohman that if defendant successfully challenged his application for unemployment compensation, he would call the authorities and report the weight problems with the seed bags, vowing that "if they want to play hardball with me, I'll play hardball with them." This threat was subsequently relayed to Matt Alcorn.

¶ 9    After Dudley's unemployment compensation was denied, he enlisted plaintiffs to help him. Hohman, Kluemke, and Michael began weighing bags without defendant's instruction or knowledge. They all found bags to be light. They then provided lot numbers and locations of underweight bags to Dudley. Dudley in turn reported the underweight bags to the Illinois Department of Agriculture, Bureau of Weights and Measures (Department).

¶ 10    On February 10 and 11, 2003, inspectors from the Department arrived at defendant's facility to investigate a complaint of underweight bags. The Department would not reveal the source of the complaint to defendant. During the investigation, the Department found underweight bags and issued five stop sale orders. After the inspectors left, defendant stopped production for 10 days while all employees, working 12-hour shifts around the clock, weighed all bags in the warehouse and brought them up to the proper weight. About 50% of the bags were light. During this process, according to Hohman, Terry Weier told him, "If we find out that anybody in this company had anything to do with us being turned in *** it will result in termination."

¶ 11    After the weighing of bags in the warehouse was completed, bags shipped prior to the date of the Department's inspection were returned and brought up to proper weight as well. The refilling of the returned bags continued until March 2003. The Department ended its investigation without issuing any penalties or fines to defendant.

¶ 12    During the Department's inspection, Alcorn began his own investigation to discover which customer had complained. He soon realized that one of the lot numbers identified by inspectors was still at defendant's facility, eliminating the possibility of a customer complaint. Alcorn concluded the complaint must have been made by an employee or a former employee who knew the company was packaging product underweight. He memorialized this belief in a memorandum to defendant's general manager, Gary Shepherd. Alcorn believed Dudley had sabotaged defendant's equipment, thereby causing the weight problems. Shepherd too

suspected Dudley but wondered how he obtained the information to provide to the Department. At some point, Alcorn called Kluemke and Michael into his office and told them that if an employee had turned information into the Department and if the company found out who it was, it would be "very job threatening."

¶ 13    On March 18, 2003, Hohman was terminated for engaging in horseplay with a forklift. According to Weier, another employee, Gerald Nottmeyer, came to his office nearly crying and very upset. Nottmeyer told him that Hohman placed the forks of his forklift under the forklift Nottmeyer was driving and lifted the forklift several inches off the ground, nearly flipping it over. James Buckman, another employee, came to Weier's office shortly thereafter and reported the incident. Weier memorialized the information in a memo which was signed by both Nottmeyer and Buckman.

¶ 14    At trial, Buckman testified that he did not believe the incident was an accident and that he believed Hohman was engaging in horseplay. Buckman stated he immediately reported the incident. Weier testified that he discussed the incident with Hohman and that Hohman stated he knew it was wrong.

¶ 15    Hohman, however, testified differently about the incident. Hohman stated that he drove up behind Nottmeyer and hit him because Nottmeyer pulled out from a side alley in front of him without sounding his horn as he was required to do. Hohman testified that Nottmeyer was not disciplined.

¶ 16    Defendant's management staff subsequently decided to terminate Hohman. Shepherd testified via deposition that none of the management staff was aware Hohman had played any role in the instigation of the investigation by the Department at the time he was terminated.

¶ 17    Also in March 2003, defendant's corporate office decided to eliminate 22 positions across its 8 holding companies as part of a reduction in force necessitated by a slowdown in business. Four positions were to be eliminated at the Nashville facility. The management staff and one of the company owners met and decided who to discharge. They evaluated employees based on job performance, attitude, skill set, cooperation with management and coworkers, and the potential for advancement. They did not review any personnel files, performance appraisals, or disciplinary records. Kluemke and Michael were two of the four employees chosen for dismissal. Their positions were terminated on April 11, 2003.

¶ 18    Alcorn testified he chose Michael for dismissal because he spent too much time standing around the docks talking, he needed a more diverse skill set, and he did not want to perform certain tasks. Alcorn chose Kluemke because he had a poor attitude, he was a "ring leader," and he did not get along with some people. Mauer testified he chose Michael for dismissal because he was not a hard worker, he stood around a lot and he often went outside to smoke. Mauer did not initially choose Kluemke. Weier testified he chose Michael because, although he did a good job in the warehouse, when he was finished with his tasks he would not look for other tasks to perform as other employees did. He chose Kluemke because, although he did a good job on the line, he was a "ring leader" and did not want to do things the way the company wanted him to. Again, the management staff claimed they were unaware either Michael or Kluemke had any role in reporting the company to the Department at the time they were discharged. Instead, the managers asserted they only learned of Michael and Kluemke's involvement in January 2004 via discovery in the instant case.

¶ 19 After hearing the foregoing evidence, the circuit court entered judgment in favor of defendant. In so holding, the circuit court applied the three-part burden of proof analysis established in federal cases for employment discrimination, which had been adopted by our appellate court in *Maye v. Human Rights Comm'n*, 224 Ill. App. 3d 353, 360 (1991) (applying the test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

¶ 20 Under this test, a plaintiff must first establish by a preponderance of the evidence that the defendant committed an adverse act against him and that a "causal nexus" existed between the protected activity and the adverse act. Once the plaintiff establishes this *prima facie* case, a rebuttable presumption arises that the defendant unlawfully discharged the plaintiff. Second, the defendant may rebut this presumption by articulating, not proving, a legitimate, nondiscriminatory reason for its decision. Third, if the defendant carries its burden of producing such a reason, the presumption fails and the plaintiff must then prove by a preponderance of the evidence that the defendant's articulated reason for discharge was not its true reason, but instead a pretext.

¶ 21 Initially, the circuit court agreed with plaintiffs that the reporting of the underweight bags was a protected activity. See *Michael v. Precision Alliance Group, LLC*, 2011 IL App (5th) 100089. The circuit court then concluded plaintiffs met their burden of establishing a *prima facie* case, finding that defendant discharged them within a short time after they reported the underweight bags to the Department through Dudley and, therefore, there was "a causal nexus" between plaintiffs' reporting and their firing. The court then stated, "[a]lthough there is no direct evidence that the defendant knew that plaintiffs were involved in the reporting of the underweight, there was circumstantial evidence produced that the defendant may have thought a plaintiff was involved because of their relationships, contacts and conversations with Dudley." As such, the circuit court concluded a rebuttable presumption arose that defendant unlawfully discharged plaintiffs and, therefore, defendant was required to articulate a legitimate reason for plaintiffs' being discharged.

¶ 22 Defendant's reason for discharging Hohman was the forklift incident. The circuit court found that this was a legitimate, nondiscriminatory reason for the discharge and, further, that Hohman failed to prove the reason was pretextual.

¶ 23 Defendant's reason for discharging Michael and Kluemke was because of a reduction in workforce. The court found that this was a legitimate, nondiscriminatory reason and, in addition, that Michael and Kluemke had failed to prove the reason for their discharges was pretextual.

¶ 24 Having concluded that the plaintiffs had failed to meet their burden under *Maye*, the circuit court entered judgment in favor of defendant.

¶ 25 The appellate court reversed and remanded. 2014 IL App (5th) 120517-U. The appellate court's analysis rested heavily on the circuit court's finding of a "causal nexus." According to the appellate court, this finding essentially meant that the circuit court had determined that plaintiffs had proved the element of causation for their retaliatory discharge claim and that plaintiffs had, in fact, been discharged for participating in protected activity.

¶ 26 The appellate court then reasoned that the circuit court had erroneously increased plaintiffs' burden, by requiring them to prove, in addition to causation, that once defendant articulated legitimate nondiscriminatory reasons for the dismissals, that the reasons were, in fact, pretextual. The appellate court stated that, "instead of requiring [defendant] to prove its

defense, the trial court required plaintiffs to both prove causation and disprove [defendant's] defense, thereby enhancing plaintiffs' burden of proof." The appellate court therefore concluded that the circuit court erred in entering judgment in favor of defendant. Moreover, the appellate court held, "given that the trial court found a causal nexus between plaintiffs' discharges and their protected activities, we need only remand this cause for further proceedings on the issue of plaintiffs' damages." This appeal followed. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 27                                                    ANALYSIS

¶ 28        It has long been the general rule in Illinois that a noncontractual or at-will employee may be discharged by his or her employer at any time and for any reason. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 182 (1978). In *Kelsay*, however, we recognized the tort of retaliatory discharge as a narrow exception to the general rule. There, we held that an employee who was terminated for pursuing workers' compensation benefits could bring an action for retaliatory discharge against her former employer. *Id.* at 181-82.

¶ 29        Later, in *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124 (1981), we held that an employee who was fired for giving information to the authorities regarding the employer's allegedly criminal activity could also bring a retaliatory discharge action against the employer. *Id.* at 133. While we reiterated that an employer generally retains the right to fire its employees "at-will," we held that an employer may not discharge an employee if a clear mandate of public policy is involved. *Id.* at 131. See also *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 525 (1985); *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 505 (1991); *Balla v. Gambro, Inc.*, 145 Ill. 2d 492, 501 (1991); *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 159-60 (1992); *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 45 (1994); *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 20 (1998).

¶ 30        While there is no precise definition of what constitutes clearly mandated public policy, a review of Illinois case law reveals that retaliatory discharge actions have been allowed in two settings: where an employee is discharged for filing, or in anticipation of filing, a claim under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1992)); or where an employee is discharged in retaliation for the reporting of illegal or improper conduct, otherwise known as "whistleblowing." *Jacobson v. Knepper & Moga, P.C.*, 185 Ill. 2d 372, 376 (1998). The rationale is that, in these situations, an employer could effectively frustrate a significant public policy by using its power of dismissal in a coercive manner. Therefore, recognition of a cause of action for retaliatory discharge is considered necessary to vindicate the public policy underlying the employee's activity, and to deter employer conduct inconsistent with that policy. *Fellhauer*, 142 Ill. 2d at 508.

¶ 31        To sustain a cause of action for retaliatory discharge, an employee must prove: (1) the employer discharged the employee, (2) the discharge was in retaliation for the employee's activities (causation), and (3) the discharge violates a clear mandate of public policy. *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 500 (2009). The requirement that the discharge be in retaliation for plaintiff's activities requires that a plaintiff establish a causal relationship between the employee's activities and the discharge. *Dixon Distributing Co. v. Hanover Insurance Co.*, 161 Ill. 2d 433, 443 (1994). When deciding the element of causation, the

ultimate issue is the employer's motive in discharging the employee. *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 336 (1998).

¶ 32    In retaliatory discharge cases, an employer is not required to come forward with an explanation for the employee's discharge, although an employer may choose to offer a reason if it desires. *Id*. If an employer provides a reason for the employee's dismissal, that does not automatically defeat a retaliatory discharge claim. However, "if an employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and the trier of fact believes it, the causation element required to be proven is not met." *Id*. Again, the burden rests on plaintiff to prove each of the elements of the cause of action. *Id*. at 337.

¶ 33    In the case at bar, defendant contends that the appellate court improperly relieved plaintiffs of their burden to establish their case. We agree.

¶ 34    In its analysis, the appellate court initially set forth the proper elements which plaintiffs were required to prove to maintain their actions for retaliatory discharge. Citing *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d 520, 525 (1985), the appellate court stated that plaintiffs would have to show that their employment was terminated, that the termination was in retaliation for the employee's actions, and the discharge violated a clear mandate of public policy. This is consistent with the rule as stated in *Clemons*. However, the appellate court never applied this standard to the facts of this case. Rather than holding plaintiffs to their burden of proving causation, *i.e.*, that their discharges were in retaliation for their protected activity, the appellate court held that plaintiffs proved causation based on the circuit court's finding of a "causal nexus" between plaintiffs' discharges and their protected activity. This was error.

¶ 35    When the circuit court found a "causal nexus," it did so as part of its application of an analysis set forth in *Maye v. Human Rights Comm'n*, 224 Ill. App. 3d 353 (1991), where a finding of "causal nexus" was necessary for establishing a *prima facie* case of discrimination under the three-part test for federal employment discrimination. However, we explicitly rejected this as the proper standard for retaliatory discharge cases in *Clemons*. For reasons that are unclear, the circuit court simply applied the wrong standard in this case. The appellate court's reliance on the circuit court's finding of a "causal nexus" was therefore misplaced. A finding of a "causal nexus" under *Maye* is not the equivalent of a finding of actual causation under *Clemons*.

¶ 36    Our conclusion that the circuit court's finding of a "causal nexus" did not amount to a finding that plaintiffs established causation is supported by the standards announced in *Clemons*. In *Clemons* we explained that, when an employer proffers a valid reason for the employee's discharge, this does not automatically "defeat a retaliatory discharge claim." However, where, as here, the employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and *the trier of fact believes it*, the causation element required for proving a retaliatory discharge claim is not met. *Clemons*, 184 Ill. 2d at 336. Here, the circuit court, as trier of fact, concluded that defendant presented reasons for plaintiffs' discharges, which it found to be valid and legitimate. For that reason, it found plaintiffs failed to meet their burden of proving that they were discharged in retaliation for their protected activity.

¶ 37    The appellate court here misapprehended the significance of the circuit court's finding of a "causal nexus" and incorrectly ignored the circuit court's ultimate determination that defendant presented valid, nonretaliatory, nonpretextual reasons for discharging plaintiffs. On

this record, we conclude that plaintiffs failed to prove the element of causation and, therefore, the circuit court correctly determined plaintiffs failed to prove a cause of action for retaliatory discharge. Accordingly, we find that the circuit court properly entered judgment in favor of defendants and the appellate court erred in reversing that judgment.

¶ 38    As an alternative argument, plaintiffs maintain that defendant could have had legitimate reasons for their discharges, which the trier of fact believed, yet the defendant could still remain liable because there can be more than one proximate cause in an action for retaliatory discharge. Defendant replies that this argument is contrary to Illinois law which clearly provides that if the trier of fact finds the employer's proffered reasons for the employee's discharge to be valid and nonpretextual, the employee has failed to show causation, one of the necessary elements of a retaliatory discharge claim. We agree with defendant.

¶ 39    Illinois law is clear. Retaliatory discharge claims are a narrow exception to the general rule that employees are at-will. Thus, if an employer comes forward with a valid, nonpretextual reason for an employee's discharge and *the trier of fact believes it*, there can be no causation in a retaliatory discharge claim. Accordingly, since the trier of fact here found defendant's reasons for discharging plaintiffs to be valid and nonpretextual, plaintiffs did not prove the element of causation and the circuit court, although applying incorrect reasoning, properly entered judgment in favor of defendant.

¶ 40                                    CONCLUSION

¶ 41    For the foregoing reasons, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 42    Appellate court judgment reversed.

¶ 43    Circuit court judgment affirmed.