2019 IL App (1st) 180907
No. 1-18-0907
Opinion Filed July 31, 2019

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| RUSSELL MATROS, | ) | |
| | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois, |
| Plaintiff-Appellant, | ) | County Department, |
| | ) | Law Division. |
| | ) | |
| v. | ) | No. 13 L 12976 |
| | ) | |
| COMMONWEALTH EDISON COMPANY, and | ) | The Honorable |
| EXELON CORPORATION, | ) | John Griffin, |
| | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1      This cause of action stems from a retaliatory discharge claim filed by the plaintiff, Russell Matros, against his former employer, the defendant Commonwealth Edison Company and its parent company, the defendant Exelon Corporation (hereinafter collectively referred to as ComEd), alleging that he was fired in retaliation for exercising his rights under the Illinois Workers' Compensation Act (Workers' Compensation Act or Act) (820 ILCS 305/1 *et seq.* (West 2012)). After a bench trial, the trial court found in favor of ComEd. The

plaintiff appeals from that judgment, contending that (1) the trial court misapplied the law regarding causation and (2) the trial court's findings were against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        From the outset, we note that the record before us is voluminous and that the seven-day bench trial included the testimony of 12 witnesses and the introduction of over 130 exhibits. We therefore set forth only those facts that are relevant to the resolution of the issues addressed in this appeal.

¶ 4        It is undisputed that the plaintiff, who is an overhead electrician specialist (OES), worked for ComEd for over 20 years, between 1979 and September 20, 2004. It is further undisputed that, during his employment with ComEd, the plaintiff filed two separate workers' compensation claims (820 ILCS 305/1-30 (West 2002)) seeking benefits from ComEd. The first such application was filed on July 8, 2003, for injuries suffered to his right shoulder on April 23, 2002 (No. 03-WC-33033). The second application was filed on October 23, 2003, for injuries suffered to his left shoulder and psyche on October 3, 2003 (No. 03-WC-51570).

¶ 5        Following a consolidated hearing on the two claims, on February 16, 2007, the arbitrator found that the injuries sustained by the plaintiff on both April 23, 2002, and October 3, 2003, arose out of and in the course of his employment with ComEd, and that both accidents were "a contributing cause" of the plaintiff's "present psychological condition of ill being." Accordingly, in case No. 03-WC-33033 the arbitrator awarded the plaintiff, *inter alia*, temporary total disability (TTD) benefits from August 20, 2002, through February 10, 2003, and additional TTD benefits from July 2, 2003, through August 5, 2003. In case No. 03-WC-51570, the arbitrator awarded the plaintiff TTD benefits, medical expenses, and penalties for

ComEd's failure to pay those benefits. ComEd filed a petition for review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission).

¶ 6    While that petition for review was pending, on March 19, 2007, the plaintiff filed his retaliatory discharge claim against ComEd, alleging that he was terminated because he exercised his right to seek workers' compensation benefits. The workers' compensation claims and the retaliatory discharge action were litigated in parallel.

¶ 7    On October 16, 2009, the Commission modified the arbitrator's decision in both cases. With respect to case No. 03-WC-33033, the Commission found that the plaintiff was suspended from his employment on July 2, 2003, through August 5, 2003, and therefore was not entitled to TTD benefits for that time period. Further, the Commission found that the plaintiff's anxiety and depression were unrelated to his April 23, 2002, right shoulder injury. With respect to case No. 03-WC-51570, the Commission found that there was "no causal connection" between the plaintiff's October 3, 2003, work injury and his current psychological condition of ill-being. Accordingly, the Commission vacated the award of TTD benefits and medical expenses since they were both incurred, *inter alia*, as a result of that "psychological condition."

¶ 8    The plaintiff appealed the decision of the Commission. On February 19, 2013, we affirmed that decision. See *Matros v. Illinois Workers' Compensation Comm'n*, 2013 IL App (1st) 113646WC-U. In doing so, we found that the record supported the Commission's finding that the plaintiff's psychological condition was not the direct and natural result of either his right or left shoulder injury. *Id.* ¶¶ 51-53.

¶ 9    While the plaintiff's workers' compensation cases were being appealed, his retaliatory discharge action proceeded with extensive discovery. Following the denial of cross-motions

for summary judgment in the retaliatory discharge action, on March 26, 2018, the matter finally proceeded to a bench trial at which the following relevant evidence was adduced.

¶ 10                    A. The Plaintiff's Case-in-Chief

¶ 11                          1. The Plaintiff

¶ 12    The plaintiff testified that he was 19 years old when he began working in the mail room at ComEd. He stated that since then he had been progressively promoted, first to lineman in 1984, then to OES, and finally to lamper in 1998. In 2001, he was a lamper at ComEd's Crestwood office, which encompasses the geographic area between 87th Street and Interstate 80, and Will Cook Road and the city limits, and his job responsibility was to repair and maintain streetlights. The plaintiff stated that he "loved [his] job" and believed he was "good at it." With about 2000 hours of overtime in 2001, he made close to $130,000 a year.

¶ 13    The plaintiff testified that prior to April 23, 2002, he had been injured at work on at least two occasions and was therefore familiar with the workers' compensation process. On April 23, 2002, the plaintiff was changing a broken streetlight when a mast bar came off the pole and in an attempt to prevent it from falling onto the street below, the plaintiff held it with his hand and it dislocated his shoulder. The plaintiff reported this incident to his supervisor and filled out an incident report. The plaintiff was initially treated by his own primary care physician, Dr. Ibrahim, who diagnosed a right shoulder sprain, prescribed medication, and released the plaintiff to full-duty work. The plaintiff's shoulder did not improve and on July 13, 2002, he sought treatment from an orthopedic surgeon, Dr. Smith. The plaintiff underwent right shoulder surgery on August 20, 2002, after which he did not return to work. He began physical therapy on September 9, 2002. While doing physical therapy, the plaintiff aggravated his shoulder, and on January 29, 2003, Dr. Smith recommended that he have an

additional MRI. The plaintiff acknowledged that ComEd accepted the injury and the treatment immediately and he was paid disability benefits during this time.

¶ 14 The plaintiff explained, however, that on February 10, 2003, he received a letter from ComEd's senior human resources (HR) consultant, Debra Staples, which shocked him. The letter stated that he had "failed to comply with the Occupational Health & Services Department [OHS] by not providing documentation to support [his] absence" and that it was "imperative" that he report to work "immediately." According to the letter, failure to comply with the request would "jeopardize [his] employment status with ComEd." The plaintiff averred that at this time and unbeknownst to him, ComEd had also stopped paying his disability benefits a week earlier.

¶ 15 Ignoring his physician's recommendations, the plaintiff returned to work the following day. From February 11, 2003, through March 19, 2003, the plaintiff was on restricted duty until his orthopedic surgeon, Dr. Smith, released him to full duty.

¶ 16 The plaintiff averred that as soon as he returned to work on February 11, 2003, he was treated differently. According to the plaintiff, his immediate supervisor, Wayne Brazeau, became less social with him and began "harassing" him with questions about when he would return to full duty. The plaintiff stated that before his injury, he had a great relationship with Brazeau because Brazeau had come from the military and did not know much about ComEd procedures and installations, so the plaintiff had "helped him along."

¶ 17 The plaintiff averred that even after he returned to full duty on March 20, 2003, his shoulder continued to bother him, and he often took pain medication (Ibuprofen) to alleviate the pain. Nonetheless, he continued to perform his duties through May 2003. The plaintiff stated that he turned in his tickets to Brazeau at the end of each day, including how many

streetlights he had repaired, and that in those three months he was never disciplined for not completing a sufficient number of repairs.

¶ 18    The plaintiff testified that on Thursday, May 1, 2003, he telephoned Brazeau early in the morning to tell him he was going to take two vacation days to attend the Kentucky Derby, which was the following day. He explained that he had attended the derby for 37 years in a row and that his friend was coming into town that afternoon so he wanted to be able to pick him up from the airport. The plaintiff also explained that because he was a lamper he could take vacation days whenever he wanted to and did not need to ask for permission first. According to the plaintiff, however, Brazeau was not available to pick up the telephone when he called and instead Marty Quinn, who was another supervisor, answered the call. Quinn told the plaintiff to telephone back in five minutes. When the plaintiff called again, Brazeau was still busy, so the plaintiff asked Quinn to pass the message to Brazeau. The plaintiff heard Brazeau talking to Quinn and responding that he wanted the plaintiff to come into work that day, but that he could have the following day off. The plaintiff came into work on Thursday, but took a vacation day on Friday.

¶ 19    The plaintiff averred that about 20 days later he was called into a meeting where he was told that he was going to lose a day's pay for not properly requesting vacation, namely not going directly through Brazeau. The plaintiff acknowledged that he had at least four meetings with Brazeau's supervisor, Anthony Cameron, regarding this incident because he believed he was not being treated fairly. The plaintiff averred that prior to that date, there had never been issues with taking vacation, and the benefit of a lamper position was the ability to take a vacation day without prior notice or permission. The plaintiff testified that, during these meetings, Cameron informed him that ComEd had changed its policy regarding vacation

while the plaintiff had been on disability. The plaintiff became suspicious and ordered his personnel file from HR, fearing that the company was attempting to add things to his record to smear his reputation. On cross-examination, the plaintiff admitted that both under the collective bargaining agreement and ComEd's policy, a lamper, like himself, needed his supervisor's permission before taking a day off but maintained that the company had previously never followed this rule to the letter.

¶ 20        The plaintiff further testified that in May 2003, he was approached by OES supervisor, Dan Gerry, who informed him that, in addition to his lamping duties, he would have to help troubleshoot other electrical problems at Crestwood. The plaintiff stated that for any type of troubleshooting, it was imperative that he had maps of the area. He averred that each electrician had his own maps (two maps, which were about two by three feet long and contained 300 pages each) and would need to highlight them for ease of reading. The plaintiff claimed that although he had seen his maps in the storeroom when he returned to work after his disability, when he searched for them in May 2003, he could not find them. The plaintiff informed Gerry that his maps were missing, and Gerry told him that Cameron had an extra set in his office. The plaintiff found this curious because Gerry did not seem upset, and because as a construction supervisor, Cameron would not need maps. Cameron gave the plaintiff the maps, which the plaintiff claimed were useless because they were not highlighted. On cross-examination, the plaintiff, however, admitted that in his prior deposition testimony, he had never stated or suggested that Cameron had purposely sabotaged his maps. In fact, he admitted that at that deposition he had testified that of all of his supervisors, he considered Cameron to be "the most honest."

¶ 21    On July 1, 2003, the plaintiff was met out in the field by Cameron. Cameron asked the plaintiff to produce his work sheet and asked him what he had been doing. The plaintiff gave his clipboard to Cameron and told him he had been on the telephone with his girlfriend for 30 minutes. Cameron instructed the plaintiff to return to headquarters for a fact-finding meeting.

¶ 22    According to the plaintiff, at that meeting, Cameron told the plaintiff that ComEd had been receiving customer reports that his truck was "just sitting," and that he was being suspended pending an investigation. The plaintiff was shocked because he did not think he had done anything wrong. He averred that after he was sent home in July, ComEd set up five meetings with him that they would then cancel last minute.

¶ 23    In July 2013, the plaintiff sought medical attention from Dr. Ibrahim because he was becoming anxious about "what was going on with his job." He had problems sleeping and eating and complained about tightness in his chest, lack of interest, and depression. Dr. Ibrahim diagnosed the plaintiff with anxiety and depression "secondary to the change of the patients' life, which is potential for him losing his job." He advised the plaintiff to see a psychiatrist and prescribed him Paxil.

¶ 24    The plaintiff returned to work on August 5, 2003, at which point he was asked to attend a meeting with management. At this meeting, the plaintiff was shown videotaped surveillance taken of his truck sitting idle in June and July 2003 and was accused of sleeping on the job. When watching these videos, the plaintiff immediately told management that he was not sleeping but was highlighting his maps inside the truck. The plaintiff said he could prove it to management by brining the maps from his truck but was refused. On cross-examination, the plaintiff admitted that when he was originally accused of sleeping in his truck on July 1, 2003, he never told anyone present at the fact-finding meeting that he had been working on

his maps. Rather, he made this assertion for the first time on August 5, 2003, after he was presented with video surveillance showing his truck sitting idly in the parking lot.

¶ 25　　The plaintiff next testified that on September 3, 2003, he implored Cameron and Gerry to watch him work because he wanted to show them what he could do. On that date, the plaintiff finished 11 lights and worked one hour of overtime. The very next day, September 4, 2003, the plaintiff was called into an "expectation meeting," where he was presented with a document listing the following relevant expectations: (1) that he leave headquarters by 8 a.m. and return by 3:10 p.m. and (2) that he complete between 15 and 20 lamp repairs per day. The plaintiff was told that if he did not meet these expectations he would be terminated.

¶ 26　　The plaintiff believed these expectations were "completely unreasonable." He explained that he could not depart before 8.a.m. because he was required to complete a thorough truck inspection before leaving the yard. Returning by 3:10 p.m. was also impossible because he had to throw all the garbage from materials used that day and restock his truck. In addition, the plaintiff stated that in his whole time as a lamper he was able to complete 15 lamps a day "maybe on two instances," which involved large parking lots or corporations with numerous lamps requiring repair at the same location. The plaintiff acknowledged that "back in the day" it may have been possible to complete 15 repairs but stated that this was before management instituted the additional paperwork and the truck inspection, which probably added another two hours to the day.

¶ 27　　The plaintiff explained that he was familiar with the work of other lampers at ComEd and that nobody came close to completing between 15 and 20 lamps per day. In fact, according to the plaintiff, in 2002, ComEd had hired an outside company to perform time studies for employees at Crestwood. According to those studies, the plaintiff could complete a

streetlamp repair in 30 minutes, and he was the number one performer at Crestwood. The plaintiff also testified that prior to his injury in 2003 he was never punished for lack of production.

¶ 28 The plaintiff testified that he attempted to meet all of the expectations set forth at the September 4, 2003, meeting because he knew he was being watched and did not want to lose his job.

¶ 29 The plaintiff averred that on September 10, 2003, and on at least two other occasions, he was nonetheless given "a hard time" for still being in the yard at 8:20 a.m. The plaintiff stated that "everyone else was still in the yard" and that he did not understand why he was being singled out. Each time the plaintiff asked management to watch him work and give him suggestions on how to be more efficient so he could leave the yard earlier, but each time, he was refused.

¶ 30 The plaintiff also acknowledged that on September 22, 2003, in a 10-hour day, he repaired a total of 10 lights but reiterated again that completing 15 lamps was impossible.

¶ 31 The plaintiff testified that on Friday, October 3, 2003, he was stocking shelves at work when he injured his left shoulder. The plaintiff reported the accident to Quinn because Brazeau was in the field. Quinn filled out the accident report and told him to go to the company clinic. Quinn drove the plaintiff to the company clinic and was present during the physician's examination. When the plaintiff questioned this, he was told that ComEd was paying for the treatment and therefore could be present. The plaintiff averred that the physician neither manipulated his arm, nor took an X-ray, but merely asked him how his arm was feeling. The physician then gave the plaintiff ibuprofen and instructed him to return to work on full duty.

¶ 32    The plaintiff made an appointment with his own physician, Dr. Smith, for Monday, October 6, 2003. The plaintiff went into work that day and informed Cameron that he had an appointment for a second opinion about his left shoulder for that afternoon at 1 p.m. Cameron first told the plaintiff that if the OHS nurse, Rita Egizio, approved, he would permit the plaintiff to take the afternoon off. The plaintiff telephoned Egizio, but she informed him that she was not authorized to let him go see his own doctor during work hours and that only Cameron could make such a decision. The plaintiff rescheduled his appointment with Dr. Smith for later in the afternoon. Dr. Smith noted pain and tightness on internal rotation of the plaintiff's left shoulder and ordered an MRI.

¶ 33    The plaintiff continued to work and, on October 7, 2003, was called into another expectation meeting, where he was told to "get it together" and informed that this would be the last time he would be reminded of the company's expectations. At the meeting, the plaintiff told Brazeau and Cameron that his left shoulder continued to bother him, but they instructed him that he had been cleared to return to full duty by the clinic physician and to go back to work.

¶ 34    Two days later, on October 9, 2003, the plaintiff again complained to Gerry and Brazeau that his shoulder was bothering him. The plaintiff was instructed to return to the company clinic. Once there, the plaintiff asked the physician to sign a medical authorization form from his workers' compensation attorney, prohibiting the physician from disclosing any information shared by the plaintiff with ComEd. The physician informed the plaintiff that he could not sign the form and then refused to examine the plaintiff.

¶ 35    The plaintiff returned to work and went to talk to Brazeau. The plaintiff testified that the conversation centered on why ComEd was forcing him to work when he had a shoulder

injury. The plaintiff acknowledged that he told Brazeau that if his shoulder "[got] all messed up because [he was] allowing him to go out there and work, some s*** going to hit the fan." The plaintiff acknowledged that after he made this statement, Brazeau ordered him to come to a coaching session for insubordination after his shift.

¶ 36     The plaintiff testified that immediately thereafter he made an appointment to see Dr. Ibrahim later that day. He denied leaving work earlier to make the appointment but acknowledged that he never attended the coaching session with Brazeau. He explained that later that afternoon Dr. Ibrahim referred him to a psychiatrist, prescribed Paxil, and put him on short-term disability leave, for psychological reasons, including depression, anxiety, and difficulty with focus and concentration. The plaintiff thereafter applied for disability leave and benefits, starting October 10, 2003, through July 2004. He remained off work until January 2004.

¶ 37     Immediately upon starting disability, on October 11, 2003, the plaintiff wrote a letter to Staples of ComEd's HR describing to her the treatment he had been receiving at work, which he characterized as "harassment" stemming from his injury and his workers' compensation claim and asking her for help. Staples did not respond to this letter or offer the plaintiff any kind of assistance.

¶ 38     While on disability, on October 23, 2003, the plaintiff began seeing a psychiatrist, Dr. Moolayil. Dr. Moolayil kept notes of their appointments and sent them to ComEd. In November 2003, the plaintiff also began seeing a licensed clinical social worker, Sara Contorer. The plaintiff told both Dr. Moolayil and Contorer that he was depressed and felt "completely lost" because his job was a "huge part" of him, and it was being threatened, and "this company that [he] used to love so much, was now treating him so relentlessly." On

cross-examination, the plaintiff admitted that although he was living with his girlfriend at the time, he told Dr. Moolayil that he was single and living alone in Tinley Park.

¶ 39    The plaintiff admitted that during his time off work, between December 11, 2003, and December 20, 2003, he traveled to Hawaii. The plaintiff claimed, however, that both his psychiatrist and the social worker encouraged him to travel to alleviate his psychological condition. He also stated that he had no idea he needed to tell ComEd he was traveling out of town.

¶ 40    On cross-examination, however, the plaintiff acknowledged that during this time period the benefits he was receiving were not workers' compensation benefits but rather disability payments under the union-offered Mutual Benefits Association/Exelon Corporation Disability (MBA) benefits plan (the MBA plan). The plaintiff agreed that one of the rules of the MBA was that an employee receiving such benefits was not allowed to leave town without the company's permission and that therefore any trips taken without such permission were made in violation of the MBA plan. Nonetheless, he averred that he was not aware of this rule at the time he took his trip.

¶ 41    The plaintiff testified that while he was in Hawaii, ComEd sent his workers' compensation attorney a notice of an independent medical examination (IME) scheduled for December 18, 2003. The plaintiff was out of town, so he could not attend. ComEd then sent a rescheduled notice of an IME for January 20, 2004. The plaintiff did not appear for this appointment either. He testified that he did not hear about the appointment from his attorney until the day of and was therefore without sufficient notice to attend.

¶ 42    On cross-examination, he admitted that at this time he was living with his girlfriend and was therefore not receiving any mail that ComEd was sending to his home address in Tinley

Park between October 2003 and January 2004. The plaintiff could not explain why he had not forwarded his mail to his girlfriend's address.

¶ 43    On January 26, 2004, the plaintiff received a letter from Staples stating that it was imperative that he report to work immediately and that failure to comply would result in his termination. He received a second letter from Staples, essentially stating the same thing, on January 28, 2004.

¶ 44    The plaintiff returned to work on January 30, 2004, because he did not want to lose his job. He acknowledged that on that same date, he immediately requested all of his vacation days (which had accumulated to over 25 days). He therefore did not return to work the following day. During his vacation in February, the plaintiff traveled on a 10-day trip to Spain with a friend. He acknowledged that they traveled by airplane, ate out, stayed at hotels, and traveled around Spain's Costa del Sol.

¶ 45    On February 5, 2004, through his worker's compensation attorney, the plaintiff filed a petition for an immediate hearing on his psychological condition being work related, which ComEd disputed.

¶ 46    On March 4, 2004, the plaintiff finally attended his third scheduled IME appointment with Dr. Reff, who had been hired by ComEd to evaluate him. The plaintiff told Dr. Reff how he was feeling (particularly that he was being targeted at work) and described the medication and treatment he had been receiving for his anxiety and depression. On cross-examination, the plaintiff acknowledged that he did not tell Dr. Reff that he had been on a 10-day vacation to Spain. Instead, he told Dr. Reff that he did not bathe regularly and that he avoided going out and driving because he was convinced that he was being followed and watched. The plaintiff also admitted telling Dr. Reff that he did not regularly read, watch

television, or perform household tasks, and that he had very little motivation to do anything except for lie around the house.

¶ 47      Dr. Reff's IME report agreed with the plaintiff's treating physicians and diagnosis. According to that report, the plaintiff suffered from major depression and the condition was causally connected to his shoulder injuries and his treatment by ComEd.

¶ 48      After the IME report, ComEd began paying the plaintiff temporary disability benefits, and he was told that his vacation days would be returned to him. The plaintiff testified that he felt vindicated. Between March and June 2004, the plaintiff continued the treatment recommended by his psychiatrist. He admitted that in that time he continued exercising at the gym both for his mental health and to treat his shoulder injury. He also admitted going to the Kentucky Derby in May 2004. In July, he had elbow surgery, which was unrelated to his prior work-related injuries. He admitted that he "felt better."

¶ 49      The plaintiff averred that, in July 2004, he learned he would undergo a second IME with Dr. Reff. The plaintiff acknowledged that before that meeting he took Klonopin, which was one of the medications he had been prescribed for "high anxiety" and which he was aware would "really kind of knock you out." On July 22, 2004, the plaintiff met with Dr. Reff and told him that he had been playing baseball with his girlfriend, going to the gym, and trying to feel better so that he could return to work as soon as possible. The plaintiff acknowledged that he later learned that before this second IME, Dr. Reff had reviewed his personnel records from ComEd as well as numerous surveillance videos taken of him during his disability leave. The trial court viewed these surveillance videotapes during cross-examination. The plaintiff admitted that in an April 14, 2004, video he appears on an elliptical machine reading a newspaper. In a July 9, 2004, video he appears jogging, playing baseball, throwing a ball,

and laughing. The plaintiff acknowledged that based on these videos, Dr. Reff's second IME report concluded that he had purposely misrepresented his condition and fabricated his psychiatric symptoms during his original IME.

¶ 50 The plaintiff testified that on July 26, 2004, he returned to work. He explained that his psychiatrist and psychologist had both advised against this but that he was afraid of losing his job. On July 30, 2004, the plaintiff was called into a meeting with Juan Garcia from HR, Barbara Stevens from OHS, and the plaintiff's union representative Harold Anthony Wilkins. At the meeting, the plaintiff was asked about why he was unable to work. It was the plaintiff's understanding that the meeting was about his medical condition. The plaintiff stated that he asked for his attorney to be present at the meeting because he believed it was inappropriate for ComEd to ask him questions about injuries that he was claiming were work related and because he believed he was going to be fired. After the plaintiff refused to answer any questions without his attorney, Cameron walked in, took the plaintiff's badge, and escorted him to the parking lot.

¶ 51 The plaintiff stated that he was so traumatized by this event, that he experienced heart palpitations and shortness of breath and could barely drive himself home. The plaintiff called his psychiatrist who recommended that he take another Klonopin. That evening the plaintiff's girlfriend took him to the emergency room, where he was diagnosed with a panic attack.

¶ 52 On September 21, 2004, the plaintiff received a letter from ComEd terminating his employment. The letter stated that "after a thorough investigation and review of all available information," ComEd had determined that he had "misrepresented [his] condition during a medical leave." The letter further stated, "Based upon this and your total work record, including but not limited to your work performance prior to taking the leave," ComEd "has

determined to terminate your employment." The plaintiff pursued a grievance through his union and believed he was going to get his job back, but the union dropped the grievance before it reached arbitration in the fall of 2005.

¶ 53        On cross-examination, the plaintiff admitted that he had a sleeping bag and pillow in his lamper truck and that he often napped during his lunch breaks. He also conceded that early on in his career he was written up for sleeping in the lounge of the ladies' room and later in his career on several occasions for sleeping in his truck during work hours.

¶ 54        On cross-examination, the plaintiff also admitted that on August 18, 2003, he filled out a medical examination report required for the annual renewal of his commercial driver's license, and that in the rubric asking him whether he suffered from any nervous or psychiatric disorders, he checked the "no" box.

¶ 55        On cross-examination, the plaintiff further acknowledged that in 1984, when he had been working for ComEd for five years, he turned in a forged physician's note to his supervisor to justify a lost day of work. The plaintiff was caught and disciplined and warned that if this happened again it would be a dischargeable offense. The plaintiff admitted that despite this warning, four years later, in 1988, he again modified a doctor's note and was caught. This time the plaintiff denied any wrongdoing, and a hearing was held at which the physician testified against the plaintiff. The plaintiff was almost discharged, but the union pleaded for his job and instead he received a five-day suspension. The plaintiff acknowledged that on at least one more occasion prior to 2003, he was informed that his "total record was unacceptable and that future incidents of unacceptable job performance could result in termination of employment."

¶ 56    On cross-examination, the plaintiff further admitted that, according to his personnel file, he was responsible for a truck accident on September 20, 1994. He acknowledged that, at that time, he was driving a ComEd truck and tipped that truck over while unloading transformers.

¶ 57                                   2. John Poland

¶ 58    John Poland next testified that between 2002 and 2004, he was employed as a lineman special at ComEd's Crestwood office and was responsible for answering all types of troubleshooting calls, including repairing streetlights, cable, and switch faults. On certain days, Poland was exclusively assigned to fixing lamps. In the morning, he would receive "tickets" indicating which lamps required repairs and would then highlight his maps to route himself to complete the tickets as efficiently as possible. Poland testified that the number of lights he could change depended on how closely they were located. He stated that on average he could repair between four to eight lamps a day because the geographic area of Crestwood was large and required at least an hour drive in each direction.

¶ 59    Poland acknowledged that in 2003 and 2004 ComEd wanted to increase its productivity and alleviate a backlog in unrepaired streetlights. Poland stated that there was pressure from ComEd that lampers repair between 15 to 20 streetlights per day but maintained that he was neither disciplined nor terminated for failing to complete that many repairs.

¶ 60    Poland recalled that on May 31, 2005, he was approached by his first-line supervisor, Gerry, and admonished about the number of streetlamps he had repaired. Gerry then told Poland that the plaintiff had always completed more repairs. When Poland asked Gerry why the plaintiff had been fired then, Gerry stated "because of his medical records." On cross-examination, however, Poland admitted that he did not know where Gerry's statement about the plaintiff's termination came from and whether it was "just gossip."

¶ 61    On cross-examination, Poland also acknowledged that he had never been disciplined for fabricating medical notes or lying in a meeting about work he had been performing. He admitted, however, that he was formally disciplined for insubordination for calling a supervisor "a bad name." He also acknowledged that the rule against insubordination was company-wide.

¶ 62    Poland also admitted that there was no reason why someone assigned to lamping duty would be sitting inside his truck for long periods of time working on troubleshooting maps (for future troubleshooting jobs) as opposed to doing lamping.

¶ 63                    3. Harold Anthony Wilkins

¶ 64    Retired overhead crew leader Wilkins next testified that he worked for ComEd for 34 years and served as a steward, chief steward, and member of the executive board of the Local 1479 union (now the International Brotherhood of Electrical Workers 15). Between 2002 and 2004, he was stationed at ComEd's Crestwood office. As a union representative, he was familiar with ComEd's disciplinary procedures and the discipline that was imposed on individual employees.

¶ 65    Wilkins supervised the plaintiff on occasion and believed that the plaintiff was a good worker who completed his work on time.

¶ 66    Wilkins explained that because of a merger with an east coast company, beginning in 2001, ComEd received an influx of new managers, including Brazeau, who had no experience in doing lineman or overhead electrical work. Wilkins believed that Brazeau had no idea how to run a ComEd unit and purposely singled out the plaintiff. He also stated that prior to the plaintiff, Cameron, who was the superintendent of the Crestwood office, had never been personally involved to such a degree in an employee's work performance.

¶ 67    According to Wilkins, it was common for employees at Crestwood not to complete all assigned tickets, take longer lunches, and not leave the yard until after 8 a.m., and Wilkins himself was never disciplined for any of these infractions. According to Wilkins, an electrician's shift, which was from 7 a.m. to 3 p.m., began with a 20 minute office meeting, followed by a mandatory truck inspection, which involved testing all of the truck equipment. After that, each electrician would receive his tickets and would need to map out the locations of each ticket, as well as determine what equipment would be required for each job. As such, according to Wilkins, leaving the yard before 8 a.m. was impossible. As a chief steward for the union, Wilkins did not know of anyone, except for the plaintiff, who was ever told they had to leave the yard by 8 a.m. or be disciplined for not doing so.

¶ 68    Wilkins similarly testified that completing 15 to 20 lamp repairs would be a "good day," and that it was impossible to guarantee that many repairs consistently. On several occasions, Wilkins told Staples, in HR, that such an expectation was unrealistic. He explained that each job was different, and that some jobs were complex, while others could be done in less than half an hour. Also, the geographic area of the Crestwood office was the largest outside of the city limits, and it would "take about two hours just driving back and forth." According to Wilkins, if a supervisor "had it in for" an employee, he could assign repairs all over the district to make it more difficult for the job to be completed.

¶ 69    Wilkins also testified that under the collective bargaining agreement lunch was "up to 59 minutes." Although he acknowledged that ComEd wanted employees to take lunch at 11:30 a.m., he testified that because a lamper, like the plaintiff, worked alone, he could take lunch outside or inside of his truck anytime of the day. Wilkins testified that such behavior was routine and that no one was ever disciplined for it.

¶ 70       Wilkins also testified that a lamper could be inside his truck planning his route or inventorying his equipment. According to Wilkins, the maps could change on a daily basis, and it would take a long time to sort them out.

¶ 71       Wilkins averred that after the change in management in 2001, ComEd became more hostile to people who were sick or off work. In addition, ComEd had a policy under which any union employee injured at work would first have to be seen by a physician at a clinic with which ComEd had a working relationship. According to Wilkins, employees often complained that they were not treated fairly by the physicians in these clinics.

¶ 72       Wilkins next testified about the different benefits that were available to union workers who were injured or sick. He explained that the MBA program was for personal illness or an injury outside of work and that workers' compensation was intended for accidents that occurred during work. According to Wilkins, under the collective bargaining agreement, an employee who was injured at work had to be given accommodation and preferential treatment, including office work, meters, or janitorial services. Wilkins explained, however, that although such jobs were abundant prior to the merger, after 2001, they became scarce and were eventually eliminated.

¶ 73       Wilkins testified that on July 30, 2004, he was called into a meeting with Garcia and Stevens involving the plaintiff. Wilkins was not given any notice of the meeting ahead of time and, once there, was told by Staples that it was a "medical" issue. On cross-examination, he admitted that before this meeting he did not know that the plaintiff had been off work for mental health issues, and had believed it was for a physical injury. Wilkins admitted that it was the plaintiff and not Staples who told him before the meeting that the leave had been for anxiety and depression.

¶ 74        Wilkins next described ComEd's "One, three, five" disciplinary procedure. As he explained, under this process, the first infraction would cause an employee to be suspended from work for one day, a second immediate infraction would result in a three-day suspension, and a third infraction in a five-day suspension. However, if a substantial amount of time transpired between the first and second infarction (perhaps a year), after the second infraction, the employee could again start with a one-day suspension. Wilkins admitted that this is how things "worked off-the-books," and that HR did not always act in the same way towards all employees. If HR "liked the employee" they would follow the "one, three, five" disciplinary procedure, but if they did not, they could "write you up for stupid things." On cross-examination, Wilkins acknowledged that under the collective bargaining agreement, "total work" record encompasses an employee's behavior from "start to finish" at ComEd.

¶ 75        At trial, Wilkins also recalled that before the plaintiff had been injured he was praised by management twice for having the highest productivity of all of the crews. On cross-examination, however, Wilkins admitted that the first of these commendations was for customer satisfaction and the second a result of an outside company monitoring employee productivity, so that the plaintiff must have been aware that his work was being scrutinized on that day. On cross-examination, Wilkins also acknowledged that he was amazed that the plaintiff was found to be the most productive during this study because being a lamper was not difficult. While a lamper could put in many streetlights and get many tickets completed, it might take Wilkins and his crew 100 days to complete one troubleshooting job because of its complexity. Wilkins also acknowledged that the plaintiff was the only lamper at the Crestwood office and therefore had major responsibility for the backlog of lamp repairs in that area.

¶ 76 On cross-examination, Wilkins also admitted that the plaintiff had several nicknames while at Crestwood, including "Sleepy," "Doc," and "pillowhead," and that he was known for sleeping in the back of his truck. Wilkins claimed, however, that everyone slept in their trucks.

¶ 77 On cross-examination, Wilkins also admitted that the plaintiff "did not know when to stop talking" and that he could be confrontational. Wilkins had seen the plaintiff being insubordinate and escalating a situation with his supervisors, including Brazeau.

¶ 78 Wilkins also admitted that the union dropped the plaintiff's grievance as to his termination but stated on redirect examination that the decision was "mostly financial."

¶ 79                                          4. Barbara Stevens

¶ 80 Stevens, who was called as an adverse witness, next testified that she is a registered nurse and the director of ComEd's OHS Department, which is the conduit between ComEd's management and ComEd's Workers' Compensation Department (WC). According to Stevens, OHS is responsible for determining an injured employee's ability to work and to return to work safely. She explained that the company requires that all injuries be immediately reported to OHS. The intake is usually made through a 1-800 number or by an employee going to see an OHS nurse. In 2002 and 2003, Egizio was the OHS nurse responsible for the Crestwood office. Stevens testified that OHS does not mandate that an injured employee sees a company doctor. Instead, they perform an assessment to determine if medical care is required, what type of care is required, and where the employee should be sent, and the employee always has the right to refuse care. Stevens testified that often employees are sent to local clinics in the area that are available for extended hours in case an employee is ill or injured.

¶ 81 Stevens was aware that the plaintiff had claimed two shoulder injuries, one on April 23, 2003, and the other on October 3, 2003, and that he had claimed that the second injury was also causing him anxiety and depression. She acknowledged that after his first injury, on January 14, 2003, ComEd had the plaintiff independently examined by Dr. Koehler, who believed that the plaintiff could return to work with a 15-pound lifting restriction effective January 15, 2003. Stevens acknowledged that Dr. Koehler e-mailed the plaintiff's treating orthopedic surgeon Dr. Smith informing him of his IME recommendation and asking Dr. Smith to provide sufficient documentation of why the plaintiff could not return to work. Stevens testified that she believed this letter was appropriate because the plaintiff had signed a medical release form. She also acknowledged that if Dr. Smith did not provide additional information to ComEd, it was OHS's position that the plaintiff could be asked to return to work immediately.

¶ 82 Stevens acknowledged that, after the plaintiff's second October 3, 2003, injury, he was first seen by nurse Egizio who sent him to a clinic. Stevens also acknowledged that on October 9, 2003, Egizio had a telephone conversation with the plaintiff, wherein the plaintiff told her that his shoulder pain was worsening. The plaintiff was again advised to go to the company clinic. Stevens admitted that in her notes, Egizio wrote that the physician at the clinic could not evaluate the plaintiff because the plaintiff asked the physician to sign a letter from his workers' compensation attorney stating that the physician could not release any information she obtained from the patient to ComEd. Egizio further noted that after this incident she contacted Robert Serritella, ComEd's workers' compensation claims analyst, who informed her that the plaintiff would have to be treated under his health insurance until it was determined whether the injury was work related.

¶ 83    Stevens acknowledged that in 2004 ComEd's WC department hired an agency to perform surveillance on the plaintiff. Stevens further acknowledged that surveillance videos were then sent to the IME physician Dr. Reff.

¶ 84    Stevens admitted that on July 30, 2004, at the behest of HR director, Garcia, she attended a meeting with Cameron, Wilkins (as the plaintiff's union representative), and the plaintiff. This was a fact-finding meeting and not a termination meeting. Although Stevens had not watched the surveillance videos prior to the meeting, she had been told that based on those videos the plaintiff "may have been practicing deceit about his current condition." The plan for the meeting was to watch the videos together with the plaintiff and give him an opportunity to explain his functioning ability and his symptoms.

¶ 85    Stevens testified that Garcia began the meeting by asking the plaintiff to explain his inability to return to work. The plaintiff immediately became defensive and asked Stevens "what there was to explain when he had sent all his medical records to ComEd." The plaintiff then spoke about the harassment he had been experiencing from management and refused to answer any questions without the presence of his attorney. The plaintiff also angrily accused Wilkins of failing to find out what the meeting would be about beforehand. The plaintiff was told there was no need for his attorney because the meeting had nothing to do with his workers' compensation claims and that he was merely being asked to explain what his symptoms were and what he believed he would be capable of doing at ComEd. The plaintiff nonetheless refused to cooperate. Stevens stated that the plaintiff was then suspended pending a review into whether he had misrepresented his medical condition.

¶ 86    Stevens also acknowledged that, on January 22, 2004, she had a conference call with Serritella from WC and that they agreed that ComEd would stop paying the plaintiff's

benefits. She denied that, at that time, OHS had made a decision that the plaintiff would either have to return to work or be terminated. She affirmatively stated that it was not OHS's role to make determinations regarding termination and that only HR could make such a decision.

¶ 87    Stevens also acknowledged that on January 26, 2004, HR sent the plaintiff a letter informing him that he had "failed to provide documentation" to OHS "to support [his] continued absences" and that, because his disability was no longer certified, it was imperative for him to return to work. She admitted that following this letter, the plaintiff sent two notes justifying his absence to OHS, including (1) from Dr. Moolayil, dated January 16, 2004, stating that the "plaintiff suffers from major depression and is unable to work at this time" and that the "depression is related in part to his job situation and injuries" and (2) from Dr. Ibrahim, dated January 29, 2004, stating that the plaintiff was under the physician's care for "depression and bilateral shoulder injury from [a] work related condition" and was "unable to return to work yet." Stevens claimed, however, that OHS determined that these letters came after the period for certification of disability and that regardless they were insufficient to support a disability.

¶ 88    In that vein, on cross-examination by ComEd's attorney, Stevens explained that to receive disability, an injured employee was required to properly fill out a "disability claim form." The front of the form included a medical release of information, acknowledging that the employee's medical documents from the treating physician would be released to ComEd. The second portion of the document required the patient and/or his treating physician to provide very specific medical information, including (1) diagnosis, (2) full detail of symptoms, (3) prognosis, (4) treatment, (5) next medical appointment scheduled, and (6) the

ability of the employee to return to work. In addition, to qualify for paid time off an employee had to be in active treatment. According to Stevens, all of the requirements in the form were MBA (or union) driven.

¶ 89      Stevens explained that, under these requirements, the two letters offered from Dr. Ibrahim and Dr. Moolayil were insufficient because they did not provide a prognosis, treatment, any clinical detail, or reasons why the plaintiff could not return to light or restricted duty. She explained that she was by no means questioning that the plaintiff suffered from depression. Instead, she was only concerned with how clinically severe the depression was. Without the letters providing a prognosis she was not permitted to make assumptions.

¶ 90      Stevens testified that, in January 2004, she was essentially faced with an employee who was off work, who had missed two IMEs, and who was submitting notes from physicians that were insufficient under the MBA to permit certification (and then payment) of any benefits. She explained that, in such a situation, it was standard procedure to ask HR to send a letter to the employee informing him of the MBA rule violation. In critical situations, the OHS would request that HR send a "last-chance" letter, in an attempt to prevent the employee from being fired, and to inform him of the immediacy of rectifying the situation. In this instance, Stevens believed the situation to be severe because certification of the benefits was impossible, and she intended HR's letters to prompt an immediate response from the plaintiff. She affirmatively stated that she had no involvement in HR's decision to terminate the plaintiff.

¶ 91                                  5. Robert Serritella

¶ 92      Serritella, called as an adverse witness, next testified that in 2002 and 2003 he was the supervisor of workers' compensation claims at ComEd, and was the individual who would decide whether a worker was entitled to such benefits. Serritella testified consistently with

Stevens and acknowledged that after the plaintiff's initial right shoulder injury, the plaintiff was independently examined by Dr. Koehler at ComEd's request, after which he returned to restricted-duty work on February 11, 2003. Serritella also acknowledged that after the plaintiff's second left shoulder injury, he personally requested the IME into the plaintiff's psychological conditions. His department also authorized the video surveillance of the plaintiff in 2004 that saw the plaintiff playing catch, reading a newspaper, washing his car, and exercising.

¶ 93    On cross-examination, Serritella stated that he had nothing to do with the decision to terminate the plaintiff. He affirmatively stated that the video surveillance he authorized was solely for the purpose of defending ComEd's workers' compensation claims.

¶ 94                                 6. Debra Staples

¶ 95    Staples, called as an adverse witnesses, next testified in 2003 and 2004 she was an HR generalist for ComEd and that, as such, she was very familiar with the plaintiff's personnel file. She acknowledged that according to that file on October 21, 1998, the plaintiff was thanked by the company for "superb representation," and that between 1988 and 2003 he had no disciplinary problems.

¶ 96    Consistent with Stevens, Staples acknowledged that on January 26 and 28, 2004, she sent letters to the plaintiff informing him that his disability was not certified by OHS and that he needed to immediately return to work. She testified that such letters were common practice and that on this occasion she had been informed by OHS that certification was impossible because the plaintiff had failed to provide documentation of his disability. She admitted that she was not aware of what kind of documentation was missing.

¶ 97    Staples testified that her first in-person interaction with the plaintiff was on May 23, 2003, at a meeting with Brazeau, where the plaintiff was being disciplined for having failed to request a day off from his supervisor. She was also involved in the July 1, 2003, meeting after which the plaintiff was suspended for "loafing" in his truck after the company had placed him on video surveillance. On cross-examination, Staples described what that surveillance had shown, including that (1) on June 13, 2003, the plaintiff was parked in two different locations for over an hour, without exiting his truck to inspect it or to move his equipment; (2) on June 19, 2003, among other things, the plaintiff's vehicle was stationary and the plaintiff did not exit that vehicle at two locations for 40 and 25 minutes respectively; and (3) on June 1, 2003, the plaintiff parked at two different locations without exiting his vehicle, before parking his vehicle at a third location from 10:58 a.m. to 12:28 p.m. and lying down inside; only six minutes and a short drive later, the plaintiff parked his vehicle again and remained seated in the driver's seat until 1:05 p.m., before he was approached by two ComEd supervisors, who ordered him back to headquarters.

¶ 98    Staples acknowledged that she was familiar with the collective bargaining agreement under which an employee is permitted "a regularly scheduled meal period not to exceed one hour except for employees whose work requires them to be on duty eight hours consecutively, in which case they shall eat at their work location." She explained, however, that this provision did not permit the plaintiff to take a lunch longer than 30 minutes. She admitted that the union and ComEd disagreed as to how this provision should be interpreted.

¶ 99    Staples also acknowledged that on October 10, 2003, the plaintiff sent her a letter claiming he was being harassed at work. She admitted that she did not investigate his claims

of harassment but explained that she was already aware of his allegations and did not believe that they constituted harassment.

¶ 100                                    7. Requests to Admit

¶ 101    After witness testimony, over ComEd's objection, the plaintiff was permitted to read several requests to admit into the record, including that (1) ComEd used the opinion of Dr. Reff as the basis to terminate the plaintiff; (2) at the time of the plaintiff's termination, ComEd was aware that the plaintiff claimed he was entitled to medical benefits under the Workers' Compensation Act; and (3) the plaintiff's treating psychiatrist, Dr. Moolayil, testified at an evidence deposition in the workers' compensation case that in his opinion the plaintiff was not malingering.

¶ 102                          B. The Defendant's Case-in-Chief

¶ 103    After the plaintiff's case-in-chief, ComEd presented the following relevant testimony.

¶ 104                                    1. Stephanie Hickman

¶ 105    ComEd's former vice president of HR, Stephanie Hickman, testified that on August 30, 2004, she signed a document titled "Termination Request Form-Union," recommending the plaintiff's termination. The document was signed by several other HR employees, as well as the director of labor relations, Bob Castle. The document was a summary detailing the investigation into the plaintiff's conduct as an employee and explaining why termination was being recommended. The document included summaries of witness interviews and meetings, as well as the employee's entire personnel file (which were prepared in part by Garcia, Staples, and Stevens).

¶ 106    Hickman testified that the document reflects that termination was being recommended on the basis of the plaintiff's "malingering, insubordination and total record." She explained that

"total record" meant the plaintiff's entire work history going back to 1979. As to misrepresentation, she stated that it related to the misrepresentation of the facts that led the plaintiff to not perform the full scope of his duties and his continued failure to perform his job in an acceptable manner. In that vein, she acknowledged that the "Termination Request Form-Union" states, "[The plaintiff] misrepresented his condition to the IME psychiatrist in order to avoid the possibility of discipline to meet the minimum expectation of his job and his insubordinate behavior."

¶ 107                                    2. Bob Charland

¶ 108        Bob Charland next testified that, in 2002 and 2003, he was the operational manager for ComEd's south region, including Crestwood. Charland acknowledged that, on July 17, 2003, together with Cameron, he prepared a document titled "Summary of Events and Actions regarding [the plaintiff]" and recommended the plaintiff's termination on the basis of the plaintiff's (1) poor job performance (*i.e.*, his failure to complete the requisite 15 to 20 streetlamp repairs per day), (2) falsification of company records and timesheets (including on at least one occasions reporting a streetlight completed when in fact it was not truly repaired), (3) infraction of the company's "Code of Conduct" policy (including sleeping or attending the gym during work hours), (4) violation of the company's safety rules by failing to report a vehicle accident in which he damaged a company truck in the parking lot, and (5) repeated injuries in the workplace by not working safely. Charland testified that this document was based on various observations of the plaintiff's work in the field, including a record of his performance, injury and vehicle accidents, as well as the counseling sessions recorded in the plaintiff's personnel file. He explained that he recommended termination on the basis of the plaintiff's "entire record," which, in his view, showed that the plaintiff could not be trusted.

¶ 109　　　Charland testified that prior to writing this recommendation, in 2003, he consulted the plaintiff's two supervisors, Cameron and Gerry, and discussed the plaintiff's low productivity with them. After this discussion, Charland requested video surveillance of the plaintiff during work hours. That video surveillance revealed the plaintiff taking extended lunches, falling asleep in his truck, and sitting curbside for extended periods of time, totaling to "over eight hours of nonproductive rest time over the course of three days."

¶ 110　　　Charland averred that his recommendation for termination was not accepted and that the plaintiff was returned to work after his suspension and remained employed on "last chance" status. Charland was not involved in the ultimate decision to terminate the plaintiff because in the fall of 2003 he was transferred to another ComEd department.

¶ 111　　　On cross-examination, Charland agreed that for a "total record" termination, ComEd needed a "new triggering event." He explained, however, that if there are things that are near termination, that are repetitive, and have longevity so as to become a pattern, the total record is sufficient. Charland opined that in the plaintiff's case, there was "absolutely a pattern of problems with integrity." In addition, he explained that the "triggering event" in the plaintiff's termination was his lack of productivity.

¶ 112　　　On cross-examination, however, Charland could not name a single other employee who was fired for failing to complete between 15 to 20 streetlight repairs a day.

¶ 113　　　　　　　　　　　　　　　3. Wayne Brazeau

¶ 114　　　Instead of live testimony, the defense next introduced the evidence deposition of the plaintiff's direct supervisor, Brazeau. In his deposition, Brazeau explained that although the plaintiff was both an OES and a lamper, his primary duties were that of lamper. As such, the plaintiff was not part of a crew but was entrusted with driving the lamper truck and repairing

streetlights on his own. Brazeau had several occasions to observe the plaintiff working and he had no issues with the plaintiff's competence as a lamper.

¶ 115    Brazeau, however, did have concerns with the plaintiff's productivity. Brazeau explained that, in 2002 and 2003, there was pressure from the municipal leadership and upper management for streetlights to be repaired in a more efficient manner and for an increase in productivity. As such, Brazeau spoke to the plaintiff on numerous occasions reminding him that ComEd now expected 15 to 20 streetlight to be repaired each day. Despite these mentoring sessions, however, the plaintiff consistently failed to meet ComEd's requirements. Brazeau chose not to discipline the plaintiff for his poor productivity and merely continued with the mentoring sessions.

¶ 116    Brazeau explained that when the plaintiff took his first disability leave between August 2002 and March 2003, Crestwood successfully increased productivity several times. Specifically, Brazeau recalled one employee who completed 25 lamp repairs on his first day on the job and then averaged about 18 repairs per day. Accordingly, when the plaintiff returned to work in March 2003, it was decided that he needed more supervision and he was assigned to both Gerry and Brazeau, with Gerry assigning the plaintiff tickets, but Brazeau acting as his direct supervisor.

¶ 117    Brazeau next testified that he was aware, both from management and from the union, that the plaintiff had a prior record of disciplinary infractions. Brazeau himself recalled three occasions on which he had to discipline the plaintiff. First, on June 21, 2002, the plaintiff was found sleeping inside his truck. Instead of formally charging the plaintiff and beginning a disciplinary process, Brazeau chose to verbally warn him and put a note in his file. Brazeau told the plaintiff that sleeping inside the truck was never acceptable for safety reasons. He

also reminded the plaintiff that it was ComEd's policy that lunch was between 11:30 a.m. and 12 p.m., and that taking lunch after that time period, without having first requested a delayed mealtime, was unacceptable.

¶ 118        Second, on May 2, 2003, the plaintiff failed to ask Brazeau for permission to take a vacation day to attend the Kentucky Derby. According to Brazeau, instead of approaching him, the plaintiff went to the Crestwood timekeeper, Quinn, who is a union employee and not a member of ComEd's management, and told him that he would need to take the day off. Crestwood's superintendent, Cameron, overheard the plaintiff speaking with Quinn and informed Brazeau that the plaintiff had failed to follow proper company procedure in requesting the day off. Brazeau testified that as a result of this infraction the plaintiff was called to a meeting on May 23, 2003, with Wilkins and Staples. Even though the plaintiff could have been more severely punished, he was issued only a formal warning and reminded of ComEd's policy regarding prior authorization for time off. He was also informed that if this occurred again, disciplinary action would be taken. Brazeau also testified that the plaintiff never claimed at this meeting that Brazeau was in fact aware that he wanted to take the day off for the Kentucky Derby. The memo detailing what transpired at the meeting, which was introduced as an exhibit at trial, similarly makes no note of any such statement made by the plaintiff.

¶ 119        Finally, on October 9, 2003, Brazeau recalled the plaintiff acting insubordinately and coarsely by informing Brazeau in front of numerous other employees that he "did not have to listen to him or to management." Brazeau averred that immediately after the plaintiff's outburst he instructed the plaintiff to go to the lineroom. After finding another supervisor and a union representative as witnesses, Brazeau informed the plaintiff that he was being

insubordinate and that he would have to return at the end of his shift for a coaching (fact-finding) session. The plaintiff told Brazeau he would leave when his shift ended and, true to his word, never appeared for the meeting.

¶ 120    After that, Brazeau did not have occasion to see the plaintiff or communicate with him until September 20, 2004, when he was asked to escort the plaintiff out of the building. Brazeau testified that he had nothing to do with the ultimate decision to terminate the plaintiff.

¶ 121                         4. Anthony Cameron

¶ 122    The defense next presented the evidence deposition of Cameron, ComEd's Crestwood construction superintendent and Brazeau's direct supervisor. Cameron acknowledged that he initiated surveillance of the plaintiff in 2003 after he was informed by Brazeau that the plaintiff was not meeting his 15 to 20 streetlight repair quota. Cameron explained that the 15 to 20 repair quota was based on the plaintiff's own representation that he could repair 3 streetlights within one hour. He also claimed that this surveillance had nothing to do with the plaintiff's workers' compensation case.

¶ 123    On July 1, 2003, Cameron was informed by surveillance that the plaintiff had been idle in his truck for a long period of time and was asked to find the plaintiff in the field. When Cameron located the plaintiff and approached his truck he observed the plaintiff sitting inside the truck without his shirt on and with his pants rolled up. Cameron did not see any maps near the plaintiff or anywhere inside the truck. The plaintiff was surprised to see Cameron and told him he had been on the telephone with his girlfriend for 30 minutes and had "just completed a ticket." Cameron asked the plaintiff to produce his tickets and the plaintiff obliged. Cameron instructed the plaintiff to return to headquarters for a fact-finding meeting.

¶ 124       According to Cameron, at this meeting the plaintiff never stated that he had been working on his maps in the truck. Instead, he claimed to have taken his lunch inside the vehicle and proceeded to the next stop when he remembered that it was July 1, so he needed to complete his truck audit which took him about 20 to 25 minutes. The plaintiff then claimed to have been on the telephone with his girlfriend for about 20 to 30 minutes. Cameron explained in his deposition that 90% of a truck audit is completed by being outside of the truck and acknowledged that, during the fact-finding meeting, Staples asked the plaintiff whether he had to be outside of his truck to complete the audit and that the plaintiff responded "yes." During the meeting, Cameron also reviewed the tickets that the plaintiff had given him. The plaintiff had written "completed" on all of the tickets but could not provide an address for one of the streetlamps he allegedly repaired. When Cameron asked him about this, the plaintiff had no response. In addition, the plaintiff admitted that although he had told Cameron that he had completed a ticket after lunch, he had not in fact done so.

¶ 125       Cameron also testified that corporate security found a pillow inside the plaintiff's truck. After the fact-finding meeting, the plaintiff was suspended pending an investigation.

¶ 126       Cameron testified that after subsequently viewing all of the surveillance videos he believed that the plaintiff was malingering, *i.e*, that he was not performing the assigned work, and was "stealing [company] time," which he considered "poor work performance." Accordingly, together with Charland, he penned a document recommending that the plaintiff's suspension end in termination. Cameron opined that he had never seen another disciplinary history where an employee was "not telling the truth as many times as the plaintiff had." He believed termination was appropriate because of the plaintiff's "total record," including poor work performance and lack of credibility. Cameron acknowledged,

however, that his recommendation for termination was denied by upper management and that instead the plaintiff was placed on "last chance" status.

¶ 127    Upon the plaintiff's return to work in August 2003, Cameron had an expectation meeting with the plaintiff, at which the plaintiff was given a written document outlining his job expectations. After that, on September 3, 2003, together with Gerry, Cameron had occasion to observe the plaintiff working in the field. On cross-examination, Cameron agreed that the plaintiff "did a great job when he was working" and that on that date he made 13 stops and completed 11 repairs. Cameron admitted that the plaintiff appeared to be working as fast as he could.

¶ 128    On cross-examination, Cameron also acknowledged that the plaintiff had told him that his right shoulder injury was affecting his production but explained that the plaintiff had made this allegation only after he was disciplined and shown the surveillance videos. Cameron acknowledged that despite the plaintiff's complaints about his shoulder injury affecting his productivity, he nonetheless expected the plaintiff to repair 15 to 20 lamps per day.

¶ 129    C. The Trial Court's Findings

¶ 130    After the close of evidence and after extensive closing arguments, the trial court ruled in favor of ComEd. In doing so, the court found that the plaintiff did not meet his burden in establishing that his discharge was causally related to the exercise of any right under the Workers' Compensation Act. The court further noted that it had found ComEd's witnesses to be credible and the plaintiff to have "significant credibility issues throughout the case." The court held that the record clearly established that the employer had a valid, nonpretextual basis for discharging the plaintiff and that the reasons for the discharge were "wholly

unrelated to the employee's claim for benefits under the Act." The court referred to the plaintiff's termination letter, which stated that the company had determined that the plaintiff had "misrepresented his condition during medical leave," and that "[b]ased upon this" and the plaintiff's "total work record, including but not limited to [his] work performance prior to taking the leave," it had determined that termination was proper. The court explained that the plaintiff's total work record revealed poor productivity, misrepresentation (including the plaintiff changing his story about what he was doing inside his truck after being presented with video surveillance), and insubordination (including the plaintiff telling Cameron that he "did not have to listen to management"). The court found all of these were valid, nonpretextual reasons for the plaintiff's discharge. The court therefore held that the plaintiff had failed to establish that he was terminated in retaliation for filing his workers' compensation claims. The plaintiff now appeals.

¶ 131                                    II. ANALYSIS

¶ 132        On appeal, the plaintiff first contends that the trial court misapplied the law when it found that the plaintiff failed in his burden to establish causation. Specifically, the plaintiff argues that the trial court improperly found that so long as ComEd had a legitimate nonretaliatory reason to terminate the plaintiff, if ComEd also terminated the plaintiff in retaliation for his filing of a workers' compensation claim, ComEd could nonetheless prevail because the illegal retaliatory reason was *one* proximate cause, if not, *the* proximate cause of the discharge. For the reasons that follow, we disagree.

¶ 133        It has long been the rule in Illinois that an at-will employee may be discharged by the employer at any time and for any reason. *Michael v. Precision Alliance Group, LLC*, 2014 IL 117376, ¶ 28. In *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978), our supreme court carved

out a limited exception to this rule when it recognized that an employee who was terminated for pursuing a workers' compensation claim could file an action for retaliatory discharge against his former employer. In that case, the court noted that the public policy underlying the Workers' Compensation Act would be seriously undermined if employers were allowed "to discharge," or "threaten to discharge," employees who sought relief under the Act. *Id.* at 182. The *Kelsay* court reasoned that the sound public policy underlying the Workers' Compensation Act dictated the recognition of an employee's cause of action for retaliatory discharge, so as to prevent an employer from presenting an employee with a choice between his job and his legal entitlement to compensation. See *id.*

¶ 134    Section 4(h) of the Act provides that it is unlawful for

"any employer, individually or through any insurance company or service or adjustment company, to discharge or threaten to discharge *** an employee because of the exercise of his or her rights or remedies granted to him or her by [the Workers' Compensation] Act." 820 ILCS 305/4(h) (West 2012).

Accordingly, as our supreme court has explained, "section 4(h) plainly prohibits a retaliatory discharge for the exercise of workers' compensation rights." *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 119 (2008).

¶ 135    Since *Kelsay*, it is well settled that in order to sustain a cause of action for retaliatory discharge based upon the filing of a workers' compensation claim, the employee must establish by a preponderance of the evidence (1) that he was an employee before the injury, (2) that he exercised a right granted by the Worker's Compensation Act (820 ILCS 305/1 *et seq.* (West 2006)), and (3) that his discharge was causally related to the exercise of his

rights under the Act. *Siekierka v. United Steel Deck, Inc.*, 373 Ill. App. 3d 214, 221 (2007) (citing *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 335-36 (1998)).

¶ 136    With respect to causation, which is the only element at issue in this appeal, Illinois does not use the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and commonly applied in federal employment discrimination and retaliation cases. *Michael*, 2014 IL 117376, ¶ 35. Rather, in Illinois the plaintiff bears the burden of establishing causation. *Id.* ¶ 31; see also *Siekierka*, 373 Ill. App. 3d at 221. In that respect, our supreme court has repeatedly emphasized that "[w]hen deciding the element of causation, the ultimate issue is the employer's motive in discharging the employee." *Michael*, 2014 IL 117376, ¶ 31; see also *Siekierka*, 373 Ill. App. 3d at 221-22 (citing *Clemons*, 184 Ill. 2d at 336).

¶ 137    In a retaliatory discharge action, an employer is not required to come forward with an explanation for the employee's discharge, and even if it does, the mere existence of a valid or sufficient reason does not automatically defeat a retaliatory discharge claim. *Michael*, 2014 IL 117376, ¶ 32 (citing *Clemons*, 184 Ill. 2d at 336); see also *Siekierka*, 373 Ill. App. 3d at 222. However, if an employer chooses to come forward with "a valid, nonpretextual basis for discharging its employees *and the trier of fact believes it*, the causation element required to be proven is not met." (Emphasis added.) *Michael*, 2014 IL 117376, ¶ 32. Any reason for discharge, even if illegal, other than the allegedly retaliatory reason will suffice, if believed by the trier of fact. See *Clemons*, 184 Ill. 2d at 337 ("we do not believe that a defendant is limited in the defense it may offer to a plaintiff's claim of retaliatory discharge, or that the allegedly illegal nature of its defense somehow relieves the plaintiff of his burden of establishing the elements of his cause of action").

¶ 138    Moreover, contrary to the plaintiff's assertion, our supreme court has expressly rejected the position that a plaintiff can succeed in establishing causation by showing that retaliation was *one* of several motives leading to the employee's discharge and therefore "a" proximate cause of that discharge. See *Michael*, 2014 IL 117376, ¶ 38; *Clemons*, 184 Ill. 2d at 338-39; see also *Phillips v. Continental Tire the Americas, LLC*, 743 F.3d 475, 477 (7th Cir. 2014) (rejecting the assertion that a plaintiff in a retaliatory discharge action is only required to show that the retaliation was "a" proximate cause of the discharge); see also *Hillman v. City of Chicago*, 834 F.3d 787, 794 (7th Cir. 2016) ("[It is] not enough for the Plaintiff to establish that his workplace injury and initiation of a workers' compensation claim set in motion a chain of events that ended in his discharge.").

¶ 139    In *Michael*, the plaintiffs maintained that even if the employer "had [a] legitimate reason" for the discharge, "which the trier of fact believed," the employer could nonetheless "remain liable because there can be more than one proximate cause in an action for retaliatory discharge." *Michael*, 2014 IL 117376, ¶ 38. Our supreme court unequivocally disagreed and held that because the ultimate issue with causation in the retaliatory discharge context is the employer's motive in discharging an employee, if a trier of fact finds the employer's proffered reasons for that discharge to be valid and nonpretextual, the employee has failed to show causation. *Id.* In doing so, our supreme court reiterated the narrow scope of retaliatory discharge claims and held that to succeed on such a claim an employee must show that he was terminated *because* of his actual or anticipated exercise of workers' compensation rights. *Id.*

¶ 140    The plaintiff's citation to the Illinois Civil Pattern Jury Instructions and the appellate court decision in *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, to the

contrary, is unavailing. In that respect, we first note that our supreme court decided *Michael* after the appellate court decided *Holland* and we therefore assume that it had the benefit of reading *Holland* before rejecting the proposition that there can be more than one proximate cause in an action for retaliatory discharge.

¶ 141     Moreover, after a close reading, we find that the two decisions are not inconsistent. In *Holland*, the jury was instructed on the plaintiff's burden of proof with Illinois Pattern Jury Instructions, Civil, No. 250.02 (2011) (hereinafter IPI Civil (2011) No. 250.02), as follows:

> " 'The plaintiff has the burden of proving each of the following propositions:
>
> First, that the plaintiff was an employee of the defendant;
>
> Second, that the plaintiff was fired from employment with the defendant;
>
> Third, that the plaintiff was fired because he exercised his right to medical care provided under the Illinois Worker's Compensation Act[;]
>
> Fourth, that the plaintiff sustained damages as a result of his firing[;]
>
> Fifth, that the reason stated in paragraph "Third" above was a proximate cause for his firing and resulting damages. ' " *Holland*, 2013 IL App (5th) 110560, ¶ 145 (quoting IPI Civil (2011) No. 250.02).

The jury was also instructed with the "short form" version of IPI Civil (2011) No. 15.01, which defined the term "proximate cause," as follows: "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury." *Holland*, 2013 IL App (5th) 110560, ¶ 146.

¶ 142     On appeal, the defendant-employer contended that the jury instructions had misstated the law on causation and permitted the jury to find liability where the employer's retaliatory motive was "a" reason for the plaintiff's discharge but not necessarily "the" reason. *Id.* ¶ 147.

While the appellate court disagreed with the defendant, it did so only because it found that the instructions defined "proximate cause" as "a cause that, in the natural or ordinary course of events, *produced* the plaintiff's injury." (Emphasis in original.) *Id.* ¶ 151. Based on this language, the court concluded that "the jury instructions correctly directed the jury to find liability *only if* [the plaintiff] proved that he was fired for exercising his rights under the Workers' Compensation Act." (Emphasis added.) *Id.* As the court explained "[t]he instructions' requirement that [the plaintiff's] workers' compensation claim must have 'produced' his discharge *limited the jury to finding liability only if* [the plaintiff] proved he was terminated for exercising his rights under the Workers' Compensation Act." (Emphasis in original.) *Id.* As such, the court found that even though the jury instructions had used the term "a" proximate cause, they limited the possibility of finding liability to only one retaliatory motive. Accordingly, the reasoning of *Holland* does not contradict our supreme court's holding in *Michael* that where the employer provides a valid nonpretextual reason for the termination, and the trier of fact believes that reason, the plaintiff has failed to prove causation. See *Michael*, 2014 IL 117376, ¶ 38.

¶ 143    Having articulated the proper burden of proof for the element of causation, we next consider whether the trial court properly applied that standard. The record reveals that based on a review of all of the evidence and on its credibility determinations, the trial court found that (1) ComEd had valid reasons for discharging the plaintiff that were unrelated to his claim of workers' compensation benefits; (2) that the court, as the fact finder, believed those reason; and (3) that the plaintiff had therefore failed to meet his burden of proving that ComEd had discharged him "on the basis of filing a [workers' compensation] claim or the basis of a dispute about the extent or duration of a compensable injury."

¶ 144    In coming to this decision, the trial court found that the two reasons for discharge articulated by ComEd, namely, that the plaintiff was terminated because of (1) his misrepresentation about his condition during medical leave and (2) his "total work" record, were valid and supported by the evidence. The court explicitly stated that the plaintiff was terminated on the basis of these two valid reasons and not because of any retaliatory motive. As the court explained, "[these] reasons for the discharge are wholly unrelated to the employee's claim for benefits under the Act." The court ended by citing *Michael*, stating: " '[I]f an employer comes forward with a valid, nonprotectural [*sic*] reason for an employee's discharge and the trier-of-fact believes it, there can be no causation in [a] retaliatory discharge claim.' And that's –that's my finding in this case."

¶ 145    Based on the aforementioned record, we find that the trial court properly considered the precise standard for causation articulated in *Michael* and properly found that ComEd's two offered nonpretextual reasons, which it found credible and supported by the evidence, equated to the plaintiff having failed to establish the requisite element of causation in his retaliatory discharge claim.

¶ 146    The plaintiff nonetheless contends, just as it did below, that the trial court was not permitted to accept ComEd's reasoning regarding his misrepresentation of his mental condition as an acceptable and valid nonretaliatory motive since he was in the midst of pursuing a workers' compensation claim regarding that condition. In support, the plaintiff cites three appellate court decisions, *Clark v. Owens-Brockway Glass Container, Inc.*, 297 Ill. App. 3d 694 (1998), *Hollowell v. Wilder Corp. of Delaware*, 318 Ill. App. 3d 984 (2001), and *Grabs v. Safeway, Inc.*, 395 Ill. App. 3d 286 (2009), all of which were decided before

*Michael* and all of which dealt with disputed medical reports in workers' compensation cases.

¶ 147    To the extent that the plaintiff contends that these decisions stand for the proposition that a trial court may never rely on evidence of an employee's disputed work-related medical condition as an acceptable and valid nonretaliatory reason for discharge, we strongly disagree.

¶ 148    In *Clark*, the employer discharged the employee because it believed that her claim for workers' compensation benefits was exaggerated. In that case, it was undisputed that the employee was fired for " '[fraudulent] misrepresentation and conduct' *in connection with her claims for workers' compensation*." (Emphasis added.) *Clark*, 297 Ill. App. 3d at 696. Under those circumstances, the court held that an employer may not discharge an employee "on the basis of a dispute about the extent or duration of a compensable injury." *Id.* at 698-99. In coming to this decision, however, the court in *Clark* explicitly stated that "this [did] not mean that an employer [could] never discharge an employee who has filed for benefits under the [Workers' Compensation] Act." *Id.* at 698. The court distinguished between a situation where an employee writes " 'bogus doctor slips' and outright lies" to his employer and "a simple dispute about the nature and extent of [a compensable] injury." *Id.*

¶ 149    Relying on *Clark*, in *Hollowell*, 318 Ill. App. 3d 984, the court similarly expressed its disapproval of an employer's reliance on an IME to discharge an employee. In that case, the employee injured his back at work, commenced treatment, and filed for workers' compensation benefits. *Id.* at 985-86. Although his personal physician instructed him to remain off of work, his supervisor suspected that he was illicitly avoiding returning to work. *Id.* at 986-87. Relying on the results of a disputed IME, the employer demanded that the

employee return to work or face discipline. *Id.* at 987. When the employee refused, his employment was terminated. *Id.* The *Hollowell* court held that an employer could not unilaterally rely on one physician's favorable diagnosis and ignore another physician's unfavorable one. *Id.* at 989. Just as in *Clark*, however, the court reiterated: "We are not saying, and did not say in *Clark*, that a fraudulent workers' compensation claim, such as \*\*\* bogus doctor's notes \*\*\*, are not a justification for termination." *Id.* Rather,

> "[W]hen there is a dispute between an [IME] and an employee's physician *with no evidence of fraud*, the employer cannot discharge the employee on the basis of suspected laziness or malingering. It is for the [Workers' Compensation Commission] to settle disputes such as this where there are conflicting medical opinions." (Emphasis added.) *Id.*

¶ 150    Finally, in *Grabs*, 395 Ill. App. 3d 286, relying on *Hollowell* and *Clark*, the court held that an employer may not rely *solely* on an IME in terminating an employee for failing to call in his absences. In that case, the plaintiffs were injured and filed claims with their employer, which were initially approved. *Id.* at 288. The plaintiffs' physicians ordered them to continue off work, but the IMEs disagreed. *Id.* 288-89. The plaintiffs followed their physicians' advice, but as a result of the IMEs, their employer recorded their absence in the attendance system, which imposed a new requirement on them to call in to work, a requirement from which they were exempt while on workers' compensation leave. *Id.* Because the plaintiffs were unaware of the change, they failed to call in to report their absences and were fired. *Id.* at 289. The court held that it would be improper for the employer to take an employment action (recoding the plaintiffs' attendance status) based *solely* on a medical report that was disputed by other physicians. *Id.* at 288 ("we find that when an employer is faced with

conflicting medical opinions from the employee's doctor and the employer's IME, an employer may not rely *solely* on an IME in terminating an employee for failing to return to work or for failing to call in his absences" (emphasis added)). However, the court also noted that a plaintiff cannot use his workers' compensation claim as a shield from compliance with other personnel rules (*id.* at 300 (citing *Finnerty v. Personnel Board*, 303 Ill. App. 3d 1 (1999))), and that an employer may fire an employee for his absenteeism or medical inability to return to his assigned position, even if that absenteeism is caused by a compensable injury (*id.* at 295-96 (citing *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 160 (1992))).

¶ 151      Accordingly, contrary to the plaintiff's position, the aforementioned decisions do not bar the trial court from considering an employee's disputed medical condition as evidence of a valid nonretaliatory reason for discharge. The decisions unequivocally distinguish between "outright lies" made by an employee relating to a workers' compensation claim and a simple "dispute about the nature and extent of [a compensable] injury." *Clark*, 297 Ill. App. 3d at 699; see *Hollowell*, 318 Ill. App. 3d at 989; *Grabs*, 395 Ill. App. 3d at 300. This is exactly what the trial court found below when it distinguished all three decisions in entering judgment in favor of ComEd. The trial court held that unlike in *Clark*, *Hollowell*, and *Grabs*, the evidence presented in this trial established that the plaintiff had engaged in outright lies about his medical condition and that he had also made prior misrepresentations about his physical infirmness to his employer, so that his discharge was not premised on any dispute about the nature or extent of his compensable injury but rather on his lack of integrity.

¶ 152      To the extent that the plaintiff claims that this finding is against the manifest weight of the evidence, we disagree.

¶ 153    It is axiomatic that the standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence. *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23 (citing *Dargis v. Paradise Park, Inc.*, 354 Ill. App. 3d 171, 177 (2004)). In reviewing a trial court's order under the manifest weight of the evidence standard, we are mindful that the trial judge, as a trier of fact, is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive. *Id*. ¶ 23 (citing *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995)). Under this standard, as the reviewing court, we may not substitute our judgment for that of the trial court unless the judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd., USA*, 384 Ill. App. 3d 849, 859 (2008). A judgment is against the manifest weight of the evidence " 'only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Battaglia*, 2015 IL App (1st) 142437, ¶ 23 (quoting *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001)). Accordingly, "[w]e will not disturb the findings and judgment of the trier of fact if there is any evidence in the record to support [its] findings." (Internal quotation marks omitted.) *Staes v. Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35.

¶ 154    In the present case, there was abundant evidence offered at trial, apart from the IME reports, that the plaintiff had been engaged in *fraudulent* conduct towards ComEd, and that ComEd had not relied *solely* on Dr. Raff's second IME report, or any disagreement between that report and the diagnosis of the plaintiff's personal physician in deciding to terminate the plaintiff. See *Clark*, 297 Ill. App. 3d 694; *Hollowell*, 318 Ill. App. 3d 984; *Grabs*, 395 Ill. App. 3d 286. In that respect, it was undisputed at trial that the plaintiff's personnel file included discipline for at least two prior instances of forged physician's notes. That personnel

file also included an instance of the plaintiff failing to report damage to a company truck, which he had caused, while in an accident. In addition, the plaintiff's manager, Cameron, testified that, on at least one occasion, the plaintiff had misrepresented to him the number of tickets he had completed. The work surveillance videos taken prior to the plaintiff's suspension similarly exposed the plaintiff's attempts at deceiving management. When confronted with sitting idly in his truck, the plaintiff claimed, among other things, that he had been performing a truck inspection, which he admitted required that he exit his truck, but the surveillance videos plainly showed that he had never exited his vehicle. As Cameron testified, he had never seen another employee's disciplinary history where an employee "had not been telling the truth as many times as the plaintiff."

¶ 155     In this respect, we also disagree with the plaintiff that the trial court should not have accepted ComEd's position that he was lying to the IME about his psychological symptoms because the Commission found that he was truly depressed and those findings were binding on the trial court. This argument misses the point. The video surveillance presented to the IME regarding the plaintiff's faking of his symptoms, and shown at trial, was not used to establish that the plaintiff did not suffer from anxiety or depression, but rather to show that he was capable of lying. The trial court was well within its authority to accept the testimony of ComEd's management that based on the plaintiff's history of prior and current misrepresentations, including his ability to forge physician's notes and fake symptoms, the plaintiff was not an employee that could be trusted.

¶ 156     For all of these reasons, we find the plaintiff's reliance on *Clark*, 297 Ill. App. 3d 694, *Hollowell*, 318 Ill. App. 3d 984, and *Grabs*, 395 Ill. App. 3d 286, unavailing.

¶ 157    The plaintiff next contends that the trial court's finding that ComEd terminated him on the basis of his "total work" record is against the manifest weight of the evidence. We disagree.

¶ 158    In the present case, the trial court explicitly found that ComEd's motivation in terminating the plaintiff on the basis of his "total work" record was valid and nonpretextual. In this respect, the court found that the evidence at trial showed that the plaintiff's personnel file revealed that he (1) had poor productivity; (2) had made numerous misrepresentations to his employer over the years, including about where he had been when his truck was observed not moving in June 2003; and (3) had been insubordinate to Brazeau after having received a final warning. After a review of the record, and for the reasons that shall be more fully discussed below, we find nothing manifestly erroneous with this conclusion.

¶ 159    On appeal, the plaintiff first asserts that contrary to the trial court's findings and the testimony of ComEd's management, the evidence at trial established that he was a good employee, who had been readily promoted and praised for his work ethic but whose supervisors were "out to get him" based on his workers' compensation filings. In support, the plaintiff initially points out that both he and his union representative, Wilkins, testified that the plaintiff was on the "kudos board" for productivity at Crestwood and that a time study completed by ComEd at that location between 2002 and 2003 revealed that he was "the most productive" employee.

¶ 160    Contrary to the plaintiff's assertion, however, the evidence presented at trial also established that, according to that time study and the plaintiff's own representations to his supervisors, the plaintiff could repair a streetlight in 30 minutes. As such, it was not unreasonable for the trial court to conclude that the plaintiff was capable of meeting

ComEd's 15 to 20 streetlight repair expectations but that he consistently failed in this regard despite repeated warnings. What is more, the day-to-day work surveillance videos played at trial established that, in June 2003, in a three-day period the plaintiff had spent eight work hours "loafing," or "sleeping" inside his truck. In this vein, Wilkins himself acknowledged that the plaintiff was known at Crestwood as "Sleepy," "Doc," and "pillowhead" because he would often be found sleeping in the back of his vehicle. While, at trial, the plaintiff denied sleeping in his truck and claimed that, on least one of these occasions, he had been working on his maps, it is undisputed that he did not come forward with this explanation until after he had been confronted with the videotaped surveillance. Moreover, Cameron testified at trial that he did not see any maps inside the plaintiff's truck when he approached him that day and that the plaintiff had misrepresented to him the amount of tickets he had completed before he was asked to return to headquarters. Under this record, the trial court found the plaintiff's testimony to be incredible. As a reviewing court, we are obliged to defer to that credibility determination.

¶ 161 The plaintiff nonetheless contends that the evidence at trial established that his supervisors at ComEd were "out to get him" because of his workers' compensation claims. In support, the plaintiff points out, *inter alia*, that after deciding to suspend him for "supposedly" sitting in his truck, in their document recommending termination on July 17, 2003, his supervisors, Charland and Cameron, noted, among other things, the plaintiff's "repeated injuries in the workplace." The plaintiff argues that this notation itself establishes that ComEd managers wanted to terminate him because of his workers' compensation filings.

¶ 162 Contrary to the plaintiff's position, however, a closer look at that document reveals that the "repeated work injury in the workplace" notation specifically refers to the plaintiff's

inability to "work safely" and includes, among other things, the plaintiff having (1) caused a truck accident in 1986; (2) caused a second truck accident in 1988; (3) cut himself because he tried to take off electrical insulation by cutting the wire towards his face; (4) tipped a truck over while loading transformers; (5) sprained his left hip while taking a shortcut, which involved jumping over a fence; (6) dropped a hotstick on his foot; and (7) caused a third truck accident in 2003. There is nothing in our case law that prevents an employee from being terminated for cause, *i.e.*, for working unsafely or causing an accident, even though the resulting injury is covered by the Workers' Compensation Act. See *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 149 (2010) (noting that an employee's discharge "for cause" has no effect on his entitlement to workers' compensation benefits).

¶ 163 Moreover, contrary to the plaintiff's assertion, the July 17, 2003, discharge recommendation lists four additional reasons for termination, none of which have anything to do with workplace injury. These include (1) poor job performance, (2) falsification of company records and timesheets, (3) infraction of the company's code of conduct, and (4) violation of the company's safety rules by failing to report damage to a truck caused by an accident.

¶ 164 More importantly, the plaintiff ignores the fact that he was not terminated on the basis of the July 17, 2003, recommendation. Rather, it was undisputed at trial that ComEd's management rejected Charland's and Cameron's discharge recommendation and instead reinstated the plaintiff after his suspension, placing him on "last chance" status. Under this record, we find nothing manifestly erroneous in the trial court's finding that there was

nothing retaliatory in ComEd's decision to ultimately terminate the plaintiff on the basis of his "total work" record.

¶ 165    In this same vein, we reject the plaintiff's assertion that his insubordination in October 2003 could not have been a reason for his discharge "because there was no evidence that ComEd actually tried to discipline him for that infraction." The plaintiff himself admitted in his testimony that on October 9, 2003, he got into a dispute with Brazeau and told him in front of other employees that "s*** would hit the fan." Brazeau explained that on that occasion, the plaintiff loudly and coarsely informed him that he did "not have to listen to [Brazeau] or management." Wilkins himself admitted to having seen the plaintiff acting insubordinately. Moreover, contrary to the plaintiff's assertion, Brazeau testified that immediately after this outburst, he informed the plaintiff, in front of two witnesses, that he would have to return to Brazeau's office after his shift for a disciplinary coaching (or fact-finding) session. The plaintiff himself admitted that he never appeared for the coaching session because he left work immediately after his shift to see his doctor, and thereafter began his second disability leave. Under these facts, we find the plaintiff's position that ComEd failed to discipline him for his insubordination, at best, disingenuous.

¶ 166    We similarly reject the plaintiff's contention that there was no "new triggering event," as required by the collective bargaining agreement, that would have permitted termination on the basis of the plaintiff's "total work" record. Contrary to the plaintiff's position, ComEd's operations manager, Charland testified that the "triggering event" in the plaintiff's case was his "lack of productivity." In that vein, the evidence at trial established that when the plaintiff was reinstated on August 5, 2003, he was notified, in writing, that he was being given one last chance and informed that his job performance had to improve and that he would be

evaluated on an ongoing basis. The plaintiff was further informed that if he failed to comply with the terms of his reinstatement he would be "subject to termination." On September 4, 2003, the plaintiff was advised of the specific job performance expectations both in person and in writing, including leaving the office no later than 8 a.m. and returning no earlier than 3:10 p.m., as well as completing between 15 to 20 streetlight repairs each day.

¶ 167    In his own testimony at trial, the plaintiff conceded that he was not meeting these expectations. Similarly, in his letter to Staples alleging that he was being harassed by his supervisors, on October 11, 2003, the plaintiff acknowledged that he was being told he was not meeting the requisite expectations since his suspension. Accordingly, we disagree with the plaintiff that there was no evidence of a "new triggering event."

¶ 168    After a review of all of the evidence presented at trial and giving, as we must, deference to the trial court on all matters of credibility, we find nothing manifestly erroneous in the trial court's determination that ComEd had valid, nonpretextual reasons to terminate the plaintiff, wholly unrelated to the filing of his workers' compensation claims, and that therefore the plaintiff failed in his burden to establish that he was discharged in retaliation for exercising his rights under the Act (820 ILCS 305/4(h) (West 2012)).

¶ 169                              III. CONCLUSION

¶ 170    For the reasons that follow, we affirm the judgment of the circuit court.

¶ 171    Affirmed.

## No. 1-18-0907

| | |
|---|---|
| **Cite as:** | *Matros v. Commonwealth Edison Co.*, 2019 IL App (1st) 180907 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-L-12976; the Hon. John Griffin, Judge, presiding. |
| **Attorneys for Appellant:** | Steven R. Saks, of Rittenberg, Buffen, Gulbrandsen, Robinson & Saks, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Garrett Boehm, of Johnson & Bell, Ltd., and Kent Sezer, both of Chicago, for appellees. |